Buck & Simmons Auto & Electric Supply Co. *et al. v.*
Kesterson.

(*Knoxville,* September Term, 1951.)

Opinion filed June 7, 1952.

M. G. GOODWIN, of Lenoir City, and HODGES & DOUGHTY, of Knoxville, for appellants.

DANNEL & FOWLER, of Loudon, for appellee.

Mr. JUSTICE BURNETT delivered the opinion of the Court.

This is a Workmen's Compensation case. The trial judge found in favor of the injured employee. The employee "suffers from traumatic or posttraumatic neurosis precipitated by said accident" and that as a result thereof the employee is totally disabled.

In the main there are two questions raised by this appeal. First, is the question of whether or not the appellants employed as many as five employees at the time of injury on August 16, 1950. This question was raised below by a plea in abatement upon which issue was

joined and proof heard. A wayside bill of exceptions preserving the evidence on this plea in abatement is in- corporated in the record. The second question is whether or not when one suffers from "a traumatic or post- traumatic neurosis" occasioned by an accident is that one entitled to compensation under the Act.

 The record shows that some three or four years prior to the accident two Simmons brothers operated a store selling electric supplies, etc., under the name of Buck & Simmons Auto & Electric Supply Company. About a year before the accident happened these two brothers purchased surplus property, including flat-top houses, from the Atomic Energy Commission at Oak Ridge and moved these houses from there to Loudon County. Kesterson, the appellee, was engaged as a laborer in helping move these houses from Oak Ridge to Loudon County when the accident claimed to have caused the injuries happened. Three men including the two Sim- mons brothers and the appellee moved these houses down roads from Anderson County into Loudon County. As they approached a barricade in a road the injured em- ployee went to move part of the barricade and a flare that was in the road and as he stooped over to do so and raised up, the truck on which one of these houses was located struck him in the neck and cut a place in his neck. From this injury, according to his statements and those of some of the doctors, one arm was paralyzed and he continued to suffer almost unbearable pain thereafter. Various doctors including the local physician of the em- ployee testify that as a result of this injury the employee suffers a traumatic neurosis which was caused by this accident. As a result of the accident, and the suffering the employee had, he was caused to and did wear a collar or a brace, known as a Thomas Collar, around his neck

for some time and was wearing it at the time of the trial. There is proof to the effect that the nerves were injured and that the employee actually, in his own mind, suffered this pain which caused him total and permanent disability. Neurosurgeons, psychiatrists and orthopedic specialists testify in the record. There are apparently no broken bones. We think the record amply supports the conclusion of the trial judge, which is based on the testimony of doctors selected by the court to make an examination, that this injury is permanent and total and that the injured employee is not feigning or just putting on. Insofar as being injured is concerned, in this way, there is no doubt. The appellants apparently concede that such is true. In their brief they say: ''From the evidence above set out it is to be seen that there was ample material evidence to support the court's finding that the petitioner's disability was due to traumatic or posttraumatic neurosis.

''The question poses itself as to whether such disability is compensable under the Workmen's Compensation Law of Tennessee—as amended in 1947.''

We will first dispose of the second question presented in this record. Code Section 6852(d) as appeared before the amendments thereto in 1947 provided that: '' 'Injury' and 'personal injury' shall mean *only* injury * * * and shall not include a disease in any form except as it shall naturally result from the injury.'' The Legislature amended this Section in 1947 to read thus: '' 'Injury' and 'personal injury' shall mean *any* injury * * * and shall include certain occupational diseases * * *''.

It is the contention of the appellants that by this change in the Act a neurosis of the kind here complained of is excluded because in the occupational diseases set forth following the 1947 amendment a neurosis of the kind is

not included and that therefore since it is not included in the occupational diseases the Act does not cover the injury here admitted. We are unable to agree with this contention. It seems to us that the amendment by inserting the word ''any'' in place of the word ''only'' really broadens the terms of the Act. By so adding these diseases the Act is not limited to these specified occupational diseases if the disability of the injured employee is a result of an injury arising out of and in the course of his employment. Prior to the 1947 amendment this Court has held in a number of cases that a disease connected with the injury was compensable. *Vester Gas Range & Mfg Co.* v. *Leonard,* 148 Tenn. 665, 257 S. W. 395; *King* v. *Buckeye Cotton Oil Co.,* 155 Tenn. 491, 296 S. W. 3, 53 A. L. R. 1086; *Sears-Roebuck & Co.* v. *Finney,* 169 Tenn. 547, 89 S. W. (2d) 749.

In *Burton-Shields Co.* v. *Steele,* 119 Ind. App. 216, 83 N. E. (2d) 623, 626, 85 N. E. (2d) 263, the Indiana Court held that the word ''injury'' in a Workmen's Compensation Act was broader than the mere reference to some objective physical break or wound to the body and includes the consequences therefrom such as mental ailments or nervous conditions. The Indiana Court also in *Kingan & Co.* v. *Ossam,* 75 Ind. App. 548, 121 N. E. 289, 292, said: ''The fact that appellee was suffering from a mental or nervous condition resulting from a physical injury, rather than from the physical injury itself, cannot have the effect of relieving appellant from liability. This court is committed to the doctrine that a 'personal injury,' as that term is used in the Workmen's Compensation Act, has reference not merely to some break in some part of the body, or some wound thereon or the like, but also to the consequence or disability that results therefrom.''

We think that by applying such a rule here we meet with the requirements of the Workmen's Compensation Act which must be construed liberally, *Thornton* v. *RCA Service Co., Inc.,* 188 Tenn. 644, 221 S. W. (2d) 954. We adopt such a rule. This rule, as so well stated by the Indiana Court, is in effect the rule that we adopted in *McCann Steel Co.* v. *Carney,* 192 Tenn. 94, 237 S. W. (2d) 942, wherein this Court quoted at length from Schneider on Workmen's Compensation to the same effect.

We now reach the first question presented which if decided in favor of the appellants would dispose of the lawsuit. This question is the one most seriously and strenuously argued by the appellants here. The record shows without dispute that two Simmons brothers operated the Buck & Simmons Auto & Electric Supply Company for several years prior to the accident. The Simmons brothers sometime prior thereto had purchased the interest of one Buck in said company. This company dealt in electric supplies, stoves, refrigerators, wire and various and sundry things. In operating this store they had two or three employees in addition to the Simmons brothers. Something like a year before this accident the Simmons brothers began to purchase the Oak Ridge Surplus houses, etc., and then took on other employees including the appellee. It is necessary to combine the two operations, that is, the Buck & Simmons Auto & Electric Supply Company business and the work of transporting these houses from Anderson County to Loudon County before there are as many as five employees within the meaning of the Act. The appellants take the position that on November 1, 1949, they sold or leased the Buck & Simmons Auto & Electric Supply Company to one Miller and that they, the Simmonses, no longer had any control over

this company. To substantiate their position they offer in the record a note given by Miller to them for some $4,000 to cover the inventory of this business and also an agreement that Miller was to have the business and keep the stock up to date for the sum of $1. He was to divide any profits fifty-fifty with the Simmons brothers when the year was out. Miller testified to this fact, that it was his business and he was running it, and that the Simmons brothers had nothing to do with it. In this statement both Simmonses agree by saying that what Miller testified about the matter was correct.

To contradict this fact the injured employee testified that prior to and up to the day of and after the accident that the store building occupied by the Buck & Simmons Auto and Electric Supply Company, the very room in which the business was being run, was the headquarters of the Simmons brothers in moving their houses; that the Simmons brothers kept keys to the Buck & Simmons Auto & Electric Supply Company place; that they went in the cash register, apparently at will, and paid out money; that they sold goods, (measured wire, etc.) to people coming in the Buck & Simmons Auto & Electric Supply Company; that they bought surplus goods from Oak Ridge which was sold through the Buck & Simmons Auto & Electric Supply Company; that a truck with a sign painted on it "Buck & Simmons Auto & Electric Supply Company" was used interchangeably by the store and the Simmons brothers in transporting these houses; that the appellee helped deliver refrigerators, etc., from the Buck & Simmons Auto & Electric Supply Company to people in Lenoir City; that he, the appellee, was paid for his services both by checks and money from the Simmons brothers and by money paid out of the cash register of the Buck & Simmons Auto & Electric Supply Company.

Other similar instances were testified to. Other witnesses, aside from the appellee, confirm this method of doing business subsequent to the time that the Simmonses and Miller say this business was transferred to Miller. Miller is contradicted in his testimony that this business became his and Buck & Simmons no longer had anything to do with it. A few instances of how he was contradicted will suffice to illustrate what we mean. In the first place Miller says that the checking account of Buck & Simmons Auto & Electric Supply Company was kept in the same name but that he signed the checks by the name of Buck & Simmons with his name as special. Miller likewise testifies that the Simmons brothers paid him for things that they got in the store and gave him checks for them, and things of the kind, and yet none of these canceled checks are offered. The original bank book or any change in the bank account is not shown. It is clearly to be inferred, it is practically the only inference, that the bank account was not changed in the least but the Simmons brothers as well as Miller could now draw on this bank account, Miller signing the checks as special when he drew them. Another instance is that one check offered in the record signed Buck & Simmons Auto & Electric Supply Company by Miller, special, is made to Miller for salary. This clearly indicates that Miller was merely an employee of the Simmons brothers. Miller had been an employee for some six years of the Simmons brothers, prior to the time he claims to have purchased this business under the note and agreement herein set out. We do not think anyone could tell what this note and agreement meant. Miller worked as a fireman twenty-four hours at Oak Ridge and had the next twenty-four hours off when he worked at the Buck & Simmons Auto & Electric Supply Company. It seems to us that the only

reasonable interpretation to be given this note or agreement is that Mr. Miller became the manager of the business and agreed to operate and manage it. He gave the note to them to secure them if he got the stock below the level they had it when he took over as manager. An auditors balance sheet of the Buck & Simmons Auto & Electric Supply Company dated December 31, 1949, two months after Miller claims to have purchased it, shows that the two Simmons brothers owned all of the capital in the business. This balance sheet does not show any interest in Miller. Certainly an auditor would not make an audit at the end of the year in this way when someone else owned the business. This audit sheet shows that the two Simmons brothers had something over $5,000 each in the capital of the business. The audit and balance sheet of a year later shows that the business was owned by the two Simmons brothers and that their capital investment was about $1,000 less each for this second year. Miller testifies that the profits of the business for that year were permitted by the Simmons brothers to remain in the business, yet their capital investment had decreased over $1,000 each. We think these are enough illustrations to justify the trial judge in not accepting these statements of Miller, that this business had been transferred to him. It is conceded that in the two operations there were five or more employees, sufficient to comply with the Workmen's Compensation Act. We find that there is ample material evidence to support the finding of the trial judge that there were five or more employees employed by the appellants so as to bring them under the provisions of the Workmen's Compensation Act.

For the reasons herein expressed the judgment below will be affirmed with costs.