Sue ORMAN, Plaintiff–Appellant,

v.

WILLIAMS SONOMA, INC. and Cigna
Insurance Company,
Defendants–Appellees.

Supreme Court of Tennessee,
at Memphis.

Jan. 14, 1991.

Steve Grubb, Ben Todd, Memphis, for plaintiff-appellant.

Leland M. McNabb, Memphis, for defendants-appellees.

## OPINION

DROWOTA, Justice.

In this workers' compensation action, the employee, Sue Orman, Plaintiff–Appellant, has appealed from a judgment of the Circuit Court for Shelby County, dismissing her complaint for workers' compensation benefits. Williams–Sonoma, Inc., Defendant–Appellee, was the Plaintiff's employer when she was injured on September 27, 1985. The dispositive issue before this Court is whether the trial court erred in determining that the employee failed to carry the burden of establishing that she sustained a compensable injury which arose out of and in the course and scope of her employment. For the reasons set forth below, we reverse and remand.

### I.

At the time of trial, the Plaintiff was 47 years old, married to a double amputee, had a high school diploma, and was essentially the sole provider for her household. Prior to being employed by the Defendant, her employment history consisted of working as a cashier, school bus driver, and manual laborer in a parts warehouse.

In June 1984, the Plaintiff was hired by Williams–Sonoma, Inc., a retailer and distributor of culinary goods and implements. While first hired to perform duties as an "order filler" in the Defendant's warehouse and distribution center, she began to work as an inspector in September, 1985. Plaintiff testified that on September 27, 1985, while taking inventory, she climbed a steel framed shelving apparatus to move some boxes and count merchandise. In making her descent, her toe became caught between the steel frame and a shelf, causing her to fall face forward onto her chest and wedge her body between two pallets on the floor below. She immediately began to experience pain in her toe, followed by pain in the shoulders, neck, and arms after returning to the inspection line.

Believing that her toe was broken, the Plaintiff consulted the next day with Dr. Michael Hutchison, the company doctor, who treated her on several occasions, specifically for the problems with her toe. Plaintiff testified that she informed Dr. Hutchison of also experiencing pain in the arms, shoulders, and back. Dr. Hutchison prescribed pain medication and informed Plaintiff that she could continue working, but with light duty.

After the Plaintiff continued to complain of pain to Dr. Hutchison, he referred her to Dr. John Howser, a neurosurgeon. Dr. Howser testified that when he first saw the Plaintiff in June 1986, the chief complaints were pain in the shoulders, arms, neck and back. He relates that she was "pushing some boxes" at work when the problems began, but she did not report an injury to her foot or state that she had fallen. After the Plaintiff underwent tests in the hospital, Dr. Howser recommended back surgery, but no surgery was performed because an orthopedic, Dr. Riley Jones, did not concur.

Subsequent to treating the Plaintiff on numerous occasions, including failed attempts with a body cast, Dr. Howser opined that she had reached her maximum point of recovery in August 1987, approximately two years after the injury. He assessed an anatomical disability rating of 2 to 5 percent without surgery, concluding: "She basically has a canal stenosis with an osteoarthritic spur and degenerative subluxation of the vertebrae...." If the Plaintiff undergoes surgery at some point in the future, the impairment rating will be considerably greater (approximately 15 percent neurologically and another 15 percent orthopedically).

Significantly, Dr. Howser advised the Plaintiff not to bend, stoop, or lift, and also stated that he was not at all surprised that she could not work. He noted: "She is significantly disabled from an industrial standpoint because of the inability to lift, bend, or stoop and having to work in a back brace, and this restricts her job opportunities to a very, very small segment of the job market...." Dr. Howser made it clear that the Plaintiff was not to do *any* bending, lifting, stooping, or climbing. Finally, he opined that her physical condition was compatible with the history of the accident as described by the Plaintiff.

In 1987, Dr. Howser referred the Plaintiff to Dr. Joseph Boals, an orthopedic surgeon, for a second opinion. Dr. Boals saw the Plaintiff on a single occasion in December 1987. He was told by the Plaintiff that she had fallen at work in September 1985, injuring her toe and eventually developing continuous back pain. Dr. Boals testified there was an inconsistency in the Plaintiff's history in that she could not recall "exactly" when the back pain began. He felt she was exaggerating the pain and recommended consultation with a psychologist, although he felt she had mild joint arthritis and a bulging disc. Dr. Boals assessed a five percent permanent anatomical disability rating to the body as a whole and concluded that it was "possible" the incident at work was the source of her problems.

From November 1989 to February 1990, the Plaintiff was treated and evaluated on five separate occasions by Dr. Jan Kloek, a psychiatrist, who described the Plaintiff as being of average intelligence and well motivated. The history taken by Dr. Kloek's office indicates that the Plaintiff had been working up until the injury, actively "lifting, carrying and pushing things." The description of the accident at work coincides with that of Plaintiff's own testimony with respect to catching her toe and falling face down between two pallets. She presented Dr. Kloek's office with a case of severe depression and anxiety concerning her inability to work, lack of income, restriction of activities, and helplessness in dealing with acute pain. The severe depression "occurred following and as a result of the pain and injury suffered from the fall." The psychiatrist testified unequivocally that the Plaintiff was not exaggerating, that she had, in fact, severe depression resulting from continuous pain and the inability to earn a living. Treatment with medication, relaxation techniques, and psychotherapy were basically unsuccessful. Dr. Kloek described her mental condition as consistent with the his-

tory of injury as related by her, stated that her prognosis in terms of finding employment was poor, and assessed 65 percent permanent psychiatric impairment to the body as a whole.

The final physician to evaluate the Plaintiff was Dr. Anthony Segal, a neurosurgeon. Dr. Segal met with the Plaintiff at the request of the employer's attorney on a single occasion in March 1988, two and a half years after the incident at work. The Plaintiff related to Dr. Segal the same description of how the accident at work occurred that was related to all the other doctors, namely, that in September 1985, she was working on a shelving apparatus, caught her toe, and fell face forward between two pallets on the floor. She complained of pain in her neck and back. Dr. Segal concluded that even if the accident had occurred in the manner described by the Plaintiff, it would not have caused the problems she was then experiencing.[1]

Prior to trial, the parties stipulated to the following: The injury occurred on September 27, 1985; the Defendant completed the "Employer's First Report of Injury" form on October 15, 1985; the applicable rate of compensation for workers' compensation purposes was $167.03 per week; medical benefits in the amount of $12,698.45 had been paid by the employer; temporary total benefits had been paid in the amount of $2,299.65; the Plaintiff reached the maximum extent of recovery on August 4, 1987; there was no dispute concerning notice, statute of limitations, or her employment status with the Defendant.

The trial in this case occurred on August 23, 1989, nearly four years after the injury. The trial court rendered the following judgment:

"1. Plaintiff's testimony regarding her injury was not credible.

2. Considering all evidence in the case, Plaintiff has failed to carry the burden of proof that she sustained an injury which arose out of and within the course and scope of her employment, and Defendants are not liable for medical expenses incurred by Plaintiff.

3. The complaint for compensation benefits should be dismissed."

II.

■ Given the fact that this case arose after July 1, 1985, the standard of review to be used by this Court is *de novo*, accompanied by a presumption of the correctness of the findings of the trial court, unless the preponderance of the evidence is otherwise. T.C.A. § 50–6–225(e). "This standard of review differs from that previously provided and requires this Court to weigh in more depth factual findings and conclusions of trial judges in workers' compensation cases. Where the trial judge has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, on review considerable deference must still be accorded to those circumstances." *Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315 (Tenn.1987); *Landers v. Firemen's Fund Ins. Co.*, 775 S.W.2d 355, 356 (Tenn.1989). Under the material evidence rule, this Court was required to accept the findings of facts of trial courts if those findings were supported by any material evidence. *Anderson v. Dean Truck Line, Inc.*, 682 S.W.2d 900, 901–02 (Tenn.1984). However, we are no longer bound by the findings of the trial court in these cases and now determine where the preponderance of the evidence lies. *Corcoran v. Foster Auto GMC, Inc.*, 746 S.W.2d 452, 456 (Tenn. 1988).

The employer argues that the Plaintiff failed to prove that the injury and disability arose out of and in the course and scope of her employment because inconsistent versions of the injury created doubts as to the weight of medical testimony offered to sup-

---

**1.** Interestingly, Dr. Segal testified: "I think we know that the litigation system increases anxiety and anger and aggravation to the patient which perpetuates and lengthens the symptoms and hurts them. * * * Experience tells us that her pain will go away when the case is settled, no matter how long she is hurt." In a letter written to defense counsel, Dr. Segal also stated that he thought "an early settlement of this case is the best thing that we can do to get this lady back to some level of function."

port her claim. The employer particularly draws our attention to Dr. Howser's testimony that Plaintiff was exaggerating complaints of pain and Dr. Segal's opinion concerning the lack of causation between the medical problems and the injury as she described it. The employee asserts that there are no significant inconsistencies between her testimony and what she told the physicians, and also that the proof concerning causation preponderates against the trial court's determination.

▮ It is well established that an injury must both "arise out of" as well as be "in the course of" employment in order to be compensable under workers' compensation. *Thornton v. RCA Service Co.*, 188 Tenn. 644, 221 S.W.2d 954, 955 (1949). The phrase "in the course of" refers to time, place, and circumstances, and "arising out of" refers to cause or origin. *Brimhall v. Home Ins. Co.*, 694 S.W.2d 931, 932 (Tenn. 1985). "[A]n injury by accident to an employee is in the course of employment if it occurred while he was performing a duty he was employed to do; and it is an injury arising out of employment if caused by a hazard incident to such employment." *Hudson v. Thurston Motor Lines, Inc.*, 583 S.W.2d 597, 599 (Tenn.1979). Generally, an injury arises out of and is in the course and scope of employment if it has a rational connection to the work and occurs while the employee is engaged in the duties of his employment. *Hall v. Auburntown Industries, Inc.*, 684 S.W.2d 614, 617 (Tenn.1985); *Bell v. Kelso Oil Co.*, 597 S.W.2d 731, 734 (Tenn.1980).

▮ Except in the most obvious, simple and routine cases, the claimant in a workers' compensation action must establish by expert medical evidence the causal relationship alluded to above between the claimed injury (and disability) and the employment activity. *Masters v. Industrial Garments Mfg. Co.*, 595 S.W.2d 811, 812 (Tenn.1980). It is entirely appropriate for a trial judge to predicate an award on medical testimony to the effect that a given incident "could be" the cause of the plaintiff's injury, when he also has before him lay testimony from which it may reason-

ably be inferred that the incident was in fact the cause of the injury. *Clarendon v. Baptist Memorial Hosp.*, 796 S.W.2d 685, 688 (Tenn.1990) (physician testified injury was "consistent" with history of accident); *Singleton v. Procon Products*, 788 S.W.2d 809, 811 (Tenn.1990); *Osborne v. Burlington Industries, Inc.*, 672 S.W.2d 757, 760 (Tenn.1984); *P & L Const. Co. v. Lankford*, 559 S.W.2d 793, 794 (Tenn.1978). The established rule concerning proof of causation was restated in *Jackson v. Greyhound Lines, Inc.*, 734 S.W.2d 617, 620 (Tenn. 1987):

> "Although absolute certainty is not required for proof of causation ... medical proof that the injury was caused in the course of the employee's work must not be speculative or so uncertain regarding the cause of the injury that attributing it to the plaintiff's employment would be an arbitrary determination or a mere possibility.... If, however, equivocal medical evidence combined with other evidence supports a finding of causation, such an inference may, nevertheless, be drawn by the trial court under the case law. * * * We have long recognized that in these cases absolute certainty on the part of a medical expert is not necessary to support a workmen's compensation award, for expert opinion must always be more or less uncertain and speculative."

▮ When the medical testimony differs, the trial judge must obviously choose which view to believe. In doing so, he is allowed, among other things, to consider the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts.

▮ All of the medical proof in this case was taken by deposition or was documentary, so that all impressions of weight and credibility must be drawn from the contents thereof, and not from the appearance of witnesses on oral testimony at trial. With this in mind, and after reviewing all the medical proof, we find ourselves in disagreement with the trial court in refer-

ence to the causation question and whether the Plaintiff has met the burden of proof in this regard. Dr. Howser, the first neurosurgeon to examine the Plaintiff, testified that her physical condition was "compatible" with the history of the accident related by the Plaintiff. Dr. Boals, the orthopedic surgeon, characterized the causal relationship as "possible." Dr. Kloek described the employee's condition as being "consistent" with the history of injury. Of the four physicians expressing an opinion on causation, Dr. Segal was the only one failing to find a causal link between the Plaintiff's physical condition and the fall. Dr. Segal evaluated the Plaintiff on a single occasion some two and a half years after the accident at the request of defense counsel for purposes of litigation. This stands in contrast to the other physicians, particularly Dr. Howser and Dr. Kloek, who had an opportunity to evaluate and treat the Plaintiff on a more extensive and timely basis. It seems reasonable that the physicians having greater contact with the Plaintiff would have the advantage and opportunity to provide a more in-depth opinion, if not a more accurate one. There is also some question about whether Dr. Segal relied, at least in part, upon medical records of an individual other than the Plaintiff.

In addition to the medical proof on causation, we must consider the testimony of the employee and her husband. The Plaintiff testified that prior to the accident, she was active athletically, was in good health, and never had any problems with her neck, back, shoulders, toe, or emotional stability. Since the fall, she had been unable to sustain her previously active lifestyle. She continually experiences acute pain, cries often, and does little cleaning or cooking. The employee's husband testified that his wife no longer works in the garden, plays in a softball league, mops or vacuums, and is emotionally unstable. The medical proof corroborates the testimony of the Plaintiff and her husband regarding the Plaintiff's physical limitations and emotional state.

Viewing the medical proof in combination with the lay testimony, we are persuaded that there exists a rational connection between the Plaintiff's physical condition and the incident that occurred on September 27, 1985, at the employer's warehouse. Thus, we find that the injury arose out of and occurred in the course and scope of the Plaintiff's employment. We reiterate the rule that causation need not be established with utmost certainty. While we are mindful that the trial court in this case did not find the Plaintiff's testimony credible, our *de novo* review fails to uncover any significant inconsistencies in the Plaintiff's testimony that justify denying benefits. She was not impeached at trial, and the trial judge did not identify or articulate any basis upon which to conclude she was not credible. Given the fact that the trial occurred nearly four years after the injury and also that the Plaintiff had undergone major cancer surgery one month prior to trial, her testimony is remarkably consistent with that of the physicians. Even if minor and insignificant details vary, an injured worker should not be penalized simply for being a poor historian. The fact remains that the Plaintiff was injured on the job, and the compensability of her injury is manifest on this record.

### III.

Having determined that the evidence concerning causation preponderates in the employee's favor, we must determine what percentage of permanent partial disability the preponderance of the evidence supports. Dr. Howser testified that the Plaintiff sustained a two to five percent permanent partial disability to the body as a whole without surgery, and approximately 30 percent with surgery. Dr. Boals assessed a five percent permanent disability rating, and Dr. Kloek, 65 percent permanent psychiatric impairment to the body as a whole.[2] These anatomical disability rat-

---

2. Disability from a mental or nervous illness is compensable when shown to be caused by a work-related accident. *Gentry v. E.I. DuPont De Nemours and Co.*, 733 S.W.2d 71, 73 (Tenn.

1987); *Buck & Simmons Auto and Elec. Supply Co. v. Kesterson*, 194 Tenn. 115, 250 S.W.2d 39, 40–41 (1952).

ings are but one factor to consider in measuring vocational disability, the ultimate issue in all workers' compensation cases. *Newman v. National Union Fire Ins. Co.,* 786 S.W.2d 932, 934 (Tenn.1990). The test is whether there has been a decrease in the employee's capacity to earn wages in any line of work available to the employee. *Corcoran v. Foster Auto GMC, Inc.,* 746 S.W.2d 452, 459 (Tenn.1988). The assessment of this disability is based on all pertinent factors, including lay and expert testimony, the employee's age, education, skills and training, local job opportunities, and capacity to work at the types of employment available in his disabled condition. *Newman,* 786 S.W.2d at 934; *Corcoran,* 746 S.W.2d at 458–59. The claimant's own assessment of his physical condition and resulting disabilities is competent testimony and cannot be disregarded. *Corcoran,* 746 S.W.2d at 458.

In the case *sub judice,* Plaintiff was 47 years old at the time of trial, had no special skills or training, and had a work history of unskilled manual labor. The medical proof clearly reveals that she is not able to bend, stoop, lift, or climb. After reviewing her physical limitations, Dr. Howser described her vocational potential as restricted "to a very, very small segment of the job market." Dr. Kloek stated that the Plaintiff suffers from severe depression and anxiety, and opined that her prognosis in terms of finding employment is "poor." Moreover, a vocational rehabilitation expert testified that the Plaintiff would not be able to resume the type of work she was accustomed to performing and would have considerable difficulty finding a job that she could perform given her age, emotional problems, poor concentration, and physical restrictions. The vocational expert noted that the Plaintiff's "occupational base has been substantially eroded in that she is not employable...." He described her as being 100% industrially disabled. In view of all the foregoing evidence, we are persuaded that the Plaintiff has sustained a 65 percent permanent partial vocational disability to the body as a whole.

The judgment of the trial court is reversed and the case remanded with instructions that a judgment be entered against the employer and its insuror in accordance with this opinion. Upon remand, the trial court should decide the manner and method that the award should be paid, calculate interest due pursuant to T.C.A. § 50–6–225(h) (Supp.1990), and address the issue of unpaid medical bills, if any. Costs of this appeal are taxed to the Appellees.

REID, C.J., and O'BRIEN, DAUGHTREY and ANDERSON, JJ., concur.