

**FILED**
**Sep 14, 2018**
**12:40 PM(CT)**
**TENNESSEE**
**WORKERS' COMPENSATION**
**APPEALS BOARD**

### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Roger Joiner | ) | Docket No. 2017-06-0343 |
| | ) | |
| v. | ) | State File No. 16021-2016 |
| | ) | |
| United Parcel Service, Inc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Joshua D. Baker, Judge | ) | |

---

### Affirmed in Part, Reversed in Part, Modified in Part, and Certified as Final
### Filed September 14, 2018

---

The employee injured his neck lifting a mailbag in the course of his work. The employer initially provided medical benefits, but subsequently limited those benefits to treatment necessary for the employee's C6-7 disc herniation while refusing to authorize treatment for a condition at the employee's C5-6 level based upon the treating physician's opinion. At trial, the primary issue was whether the employee suffered a compensable aggravation of his pre-existing C5-6 condition. Concluding the causation opinion of the employee's medical evaluator overcame the statutory presumption of correctness applicable to the treating physician's causation opinion, the trial court determined the employee was entitled to medical benefits for treatment for his work-related injuries at C5-6 and C6-7 and to permanent partial disability benefits based upon the employee's medical impairment attributable to both his C5-6 and C6-7 levels. The employer has appealed. We conclude the medical proof was insufficient to establish a compensable aggravation of the employee's pre-existing C5-6 condition and reverse the trial court's determination in that regard. We modify the award of medical benefits to exclude treatment for the employee's cervical spine at the C5-6 level, and we modify the award of permanent disability benefits to provide 22.5 weeks of benefits based upon a 5% impairment rating. We certify as final the trial court's order as affirmed in part, reversed in part, and modified in part.

Judge David F. Hensley delivered the opinion of the Appeals Board in which Presiding Judge Marshall L. Davidson, III, joined. Judge Timothy W. Conner dissented.

David T. Hooper, Brentwood, Tennessee, for the employer-appellant, United Parcel Service, Inc.

Jason Denton and Brett Rozell, Lebanon, Tennessee, for the employee-appellee, Roger Joiner

**Factual and Procedural Background**

Roger Joiner ("Employee"), a fifty-year-old resident of Wilson County, Tennessee, injured his neck on February 26, 2016, while lifting and tossing a mailbag in the course and scope of his employment with United Parcel Service, Inc. ("Employer"). He initially believed he had injured his left shoulder, as he felt a pop in his shoulder at the time of the incident and experienced immediate numbness and tingling in both hands. Within a few hours he began to have extreme pain in his left shoulder and reported the incident to his supervisor, who offered emergent care. Employee declined medical care at that time, thinking he might have pulled a muscle and that he would recover over the weekend. However, when his pain became unbearable the following Sunday afternoon, he visited University Medical Center's emergency department in Lebanon, Tennessee. He reported that he had been experiencing left shoulder pain since lifting a mailbag two days earlier when he felt a pop in his shoulder. The diagnoses in the emergency physician's report included a left shoulder sprain, muscle spasms, and left scapular strain. Employer subsequently provided Employee a panel of physicians, and Employee was thereafter seen at Premier Orthopedics & Sports Medicine for further treatment.

On March 9, 2016, Employee was seen by Dr. Malcolm Baxter, an orthopedic surgeon, who noted Employee was suffering from "pain and numbness in both arms from the neck" with acute pain in the left shoulder "radiating into the scapula down the arm with numbness in the forearm and hand." Dr. Baxter noted Employee's shoulder x-rays were unremarkable and ordered an MRI of Employee's left shoulder, adding "[i]t seems like a lot of the pain may be coming from the neck as well." The MRI indicated no significant shoulder pathology and no evidence of rotator cuff tear or labral tear. Dr. Baxter initiated physical therapy and noted that Employee "may end up needing to see someone about his neck." At Employee's April 14, 2016 follow up with Dr. Baxter, the doctor noted that Employee "really is dealing with a neck problem." Employee reported improvement in his pain with a Medrol Dosepak, and Dr. Baxter prescribed another Dosepak and ordered an MRI of Employee's cervical spine.

The cervical MRI revealed a C6-7 left disc protrusion "with extruded fragment with mild narrowing of central canal." At the C5-6 level, the report described moderate right neural foraminal stenosis. When Employee returned to Dr. Baxter on May 2, 2016, Dr. Baxter released Employee from his care regarding his shoulder, stating "I think he needs to see a neck specialist." Employee was referred to Dr. Christopher Kauffman, an orthopedic surgeon who treats cervical issues.

Employee first saw Dr. Kauffman on May 24, 2016, and he reported "neck pain, left arm pain, left arm numbness, and left arm weakness." Dr. Kauffman did not record any complaints or symptoms related to Employee's right arm at that visit. Dr. Kauffman testified he reviewed both the radiologist's report of the cervical MRI and the actual films, stating the MRI showed "[m]ild disc degeneration at C5-6 without neurological impingement," and a large left-sided disc herniation at C6-7 he described as "migrat[ing] inferior to the C6 vertebral body displacing the exiting C6-7 nerve root." Dr. Kauffman noted that Employee's complaints were "consistent with cervical disc herniation and radiculopathy." He recommended surgery, noting that he discussed with Employee both an anterior cervical discectomy and fusion at the C6-7 level and a C6-7 discectomy with disc arthroplasty.

On June 3, 2016, Employee returned to Dr. Kauffman with continuing complaints of neck and left arm pain, as well as numbness and weakness in his left arm that Employee described as being "constant" and "generally worse at night." Dr. Kauffman again noted Employee's complaints were "consistent with cervical disc herniation and radiculopathy," and he stated in his report that he "put in for surgery with the patient's Work[ers'] Compensation." Dr. Kauffman noted that Employer had submitted the surgery recommendation to utilization review, which agreed with his recommendation, adding that "however the patient's adjuster wish[es] for us to go to the medical director." He further noted that he had discussed two surgical options with Employee, that Employee wished to proceed with cervical disc arthroplasty, and that "[t]he only thing delaying the surgery at this time is [the medical director's] review."

Employee returned to Dr. Kauffman on June 17, 2016 for a preoperative evaluation. At that time, Dr. Kauffman noted that Employee had new complaints of "radiating right upper extremity pain for the last week," also stating in his report that Employee denied "radiating right upper extremity pain prior to one week ago." Dr. Kauffman noted that Employee had not complained of right upper extremity symptoms on previous visits, adding "so [it was] my impression that this disc osteophyte was not causing symptomatic compression." He indicated the C5-6 osteophyte complex was likely causing the right upper extremity radiating pain and stated in his report that he explained to Employee "this is not a work-related condition."

Dr. Kauffman continued to recommend surgery at the June 17, 2016 visit, stating "the C5-6 disc osteophyte complex . . . could be treated at the same time as the C6-7 disc herniation," but he again noted in his report that Employee's right upper extremity pain was "not a work-related condition." The June 17, 2016 report stated that Dr. Kauffman discussed "the possibility of a [two] level disc arthroplasty procedure versus a [two] level [anterior discectomy and fusion]," and that it was his recommendation at that time "for the patient [to] proceed with a [two] level anterior cervical discectomy and fusion rather than the [two] level disc arthroplasty." In his deposition, Dr. Kauffman explained that at the June 17, 2016 visit he "still thought the C6-7 disc herniation was causing the left arm

3

pain." He testified "[t]here was a small right-sided disc osteophyte," and he "thought that the C5-6 disc osteophyte complex is likely causing the radiating right upper extremity pain." Consistent with his written report, he testified he "explained to the patient that this is not a work-related condition." Dr. Kauffman further noted in his report that "we would have to ask Work[ers'] Compensation whether or not [they] would want to consider splitting the cost of surgery [with] the patient's regular health insurance or whether they would cover the cost of the additional surgery at C5-6." In his deposition, Dr. Kauffman testified that in discussing the surgery he explained to Employee that he "would not consider the C5-6 disc as part of the rating following surgery," adding that Employee was "amenable with this and agrees that the right upper extremity pain did not develop until three months after injury."

Employer again authorized surgery to address the C6-7 herniation, and Employee's health insurer approved surgery to address the C5-6 condition. On August 29, 2016, Employee returned to Dr. Kauffman for a preoperative evaluation, and Dr. Kauffman noted in his report that Employee wanted to proceed with the C6-7 disc arthroplasty versus the anterior cervical discectomy and fusion. He further noted in his report that "[t]he plan for surgery is for C5-6 and C6-7 anterior discectomy to decompress the spinal cord and disc arthroplasty at both interspaces." The surgery was performed on September 1, 2016.

Describing the surgical procedures, Dr. Kauffman testified he performed "C5-6 and C6-7 anterior discectomies with disc arthroplasty where C6-7 was a soft disc herniation." He described C5-6 as "more spondylosis or arthritis." When asked to elaborate on this description, he testified "[s]pondylosis can either be a calcified disc that previously herniated or a result of disc degeneration, meaning aging process. It can cause similar symptoms, but it's more of a bone – people would consider a bone spur in layman's terms."

Employee began a course of physical therapy following surgery. At an October 12, 2016 postoperative visit with Dr. Kauffman, Employee continued to complain of neck pain and symptoms of occasional numbness in both arms. He had completed the initial physical therapy regimen at the time of that visit, but Dr. Kauffman noted Employee "does not feel he is able to do his job." Dr. Kauffman recommended a work conditioning program, which Employer authorized. When Employee returned to Dr. Kauffman on November 21, 2016, Dr. Kauffman released Employee to return to work, noting that he expected Employee would be at maximum medical improvement at the next visit.

When Employee was next seen by Dr. Kauffman on December 19, 2016, he had returned to full duty work, but he continued to report that his preoperative symptoms persisted. After examining Employee, Dr. Kauffman placed Employee at maximum medical improvement and assessed a 5% permanent impairment to the body as a whole, which Dr. Kauffman made clear was "based on the work-related injury . . . and will not

4

[include] the adjacent level disc degeneration which was not work-related." In his deposition, Dr. Kauffman was asked to give his causation opinion. Addressing Employee's C6-7 herniated disc, Dr. Kauffman testified the cause of the herniated disc was Employee's "work-related injury." Asked to state his opinion concerning the cause of the condition at Employee's C5-6 level "to a reasonable degree of medical certainty," Dr. Kauffman responded, "[n]ormal aging process." When asked whether there was "any relationship at all between that level and [Employee's] work [incident] that resulted in the acute injury to the C6-7 level," he responded, "[n]ot in my opinion."

Dr. Kauffman acknowledged on cross-examination that he had not seen any medical records indicating that Employee had reported symptoms involving his neck or had suffered an injury at the C5-6 level prior to the work incident. He acknowledged that the spondylosis he determined to be present at the C5-6 level could be aggravated by an acute event such as the reported work incident. However, when asked his opinion on redirect examination regarding whether Employee's spondylitic problems were aggravated by the work incident, Dr. Kauffman said, "[m]y opinion was since it showed up so many months later that it was unrelated."

On July 28, 2017, Dr. Stephen Neely, an orthopedic surgeon, performed an examination at Employee's request. He stated in his report that he was "unable to differentiate C5-6 injury from C6-7," although he did note that Employee had "pre-existing disease at C5-6 which was evident on the initial cervical films." His report also reflected it was his "feeling that both of these injuries at 5-6 and 6-7 stem from his workplace injury" and noted he was "truly not sure how one would be able to clearly separate which injuries were from a time span when the history places them both as having been secondary to the injury." He assigned a 19% impairment that included the injuries at both C5-6 and C6-7.

At trial, Dr. Neely testified in person, stating that, based upon his review of the medical records and his interview of Employee, he thought Employee was initially having symptoms in both arms, which Employee thought were shoulder-related, and that the symptoms "then seemed to shift more to the left." He testified it was his "feeling that both of these injuries at C5-6 and at C6-7 stem from the workplace injury," adding that, similar to the statement in his report, he was "truly not sure how one would be able to clearly separate which injuries were from the time span when the history placed them both as having been secondary to the injury." Dr. Neely further testified he was "just unable to tell whether one level was injured or two levels were injured in a person that has never had any symptoms in their neck prior to the injury." He stated that prior to the work incident Employee "had neck trouble but it was subclinical and it did not produce pain and did not produce any limitation."

After describing his diagnosis to include "a large rupture with extruded fragment at C6-7 with left radiculopathy" and "a large central and right-sided disc rupture and an

arthritic level of a spondylitic level of his spine" at C5-6, Dr. Neely was asked his opinion "as to whether or not that diagnosis and those injuries were related to his work-related incident." He responded that he thought Employee "had a significantly spondylitic level which was documented in the . . . x-rays two days after the injury. Those things didn't come about in those previous two days. He had them, but they were subclinical, and after this injury they became clinical." When asked "whether or not those injuries were related to the [work incident]," he testified he had "a hard time separating the two from a patient that had no symptoms to a patient that had bilateral symptoms after this injury." Pressed further to address causation, he was asked "[s]o what is the answer to that [causation] question in your opinion," and he responded, "I think they're related to the injury."

Following the trial, the court awarded medical and permanent partial disability benefits based upon injuries at both C5-6 and C6-7, concluding the injury at C5-6 was a "compensable aggravation of [Employee's] pre-existing condition." Noting that Employee's own testimony, the testimony of Dr. Neely, and the medical reports of Employee's initial providers were more persuasive than Dr. Kauffman's reports and testimony, the trial court concluded that Employee successfully rebutted the presumption of correctness afforded to Dr. Kauffman's causation opinion. Accordingly, the court determined that Employee retained 19% impairment to the body as a whole and was entitled to permanent partial disability benefits in the amount of $72,794.70, calculated as 85.5 weeks of benefits at the weekly rate of $851.40. The court ordered Employer to continue to provide ongoing medical treatment for Employee's injuries with Dr. Kauffman serving as Employee's authorized treating physician. Employer has appealed.

**Standard of Review**

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2017). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2017).

**Analysis**

Employer contends the trial court erred in determining Employee suffered a compensable aggravation of his pre-existing condition at C5-6. It asserts the preponderance of the evidence does not support the trial court's conclusion that Employee overcame the presumption of correctness afforded Dr. Kauffman's causation opinion. Additionally, Employer asserts Employee's permanent impairment is 5% as determined by Dr. Kauffman, and that the trial court erred in awarding permanent disability benefits based upon the 19% impairment rating assessed by Dr. Neely.

An employee must establish by a preponderance of the evidence that he or she is entitled to benefits. *See* Tenn. Code Ann. § 50-6-239(c)(6). To prove his or her entitlement to benefits, an employee must establish that the injury arose primarily out of and in the course and scope of employment. Tenn. Code Ann. § 50-6-102(14) (2017). To establish that an injury arose out of the employment, an employee must show "by a preponderance of the evidence that the employment contributed more than fifty percent (50%) in causing the injury, considering all causes." Tenn. Code Ann. § 50-6-102(14)(B). An "accidental" injury generally does not include the aggravation of a pre-existing condition "unless it can be shown to a reasonable degree of medical certainty that the aggravation arose primarily out of and in the course and scope of employment." Tenn. Code Ann. § 50-6-102(14)(A). Furthermore, an employee has the burden of proving, to a reasonable degree of medical certainty, that the work accident "contributed more than fifty percent (50%) in causing . . . the need for medical treatment, considering all causes." Tenn. Code Ann. § 50-6-102(14)(C). The phrase "shown to a reasonable degree of medical certainty" is defined as requiring the "opinion of the physician" to establish that the injury "more likely than not" caused the need for medical treatment, "considering all causes." Tenn. Code Ann. § 50-6-102(14)(D); *see also Miller v. Lowe's Home Centers, Inc.*, No. 2015-05-0158, 2015 TN Wrk. Comp. App. Bd. LEXIS 40, at *13 (Tenn. Workers' Comp. App. Bd. Oct. 21, 2015) ("[A]n employee can satisfy the burden of proving a compensable aggravation if: (1) there is expert medical proof that the work accident 'contributed more than fifty percent (50%)' in causing the aggravation, and (2) the work accident was the cause of the aggravation 'more likely than not considering all causes.'").

A "trial judge has the discretion to determine which testimony to accept when presented with conflicting expert opinions." *Payne v. UPS*, No. M2013-02363-SC-R3-WC, 2014 Tenn. LEXIS 1112, at *18 (Tenn. Workers' Comp. Panel Dec. 30, 2014). Thus, when medical opinions differ, as in this case, "the trial judge must obviously choose which view to believe. In doing so, [the trial judge] is allowed, among other things, to consider the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts." *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 676 (Tenn. 1991). Irrespective of which of the competing medical opinions a trial court

chooses to accept, the opinions must satisfy the statutory requirements for a claim to be compensable.

Here, to succeed in recovering workers' compensation benefits for an aggravation of his pre-existing C5-6 condition, Employee had to show to a reasonable degree of medical certainty that the aggravation of his pre-existing C5-6 condition arose primarily out of and in the course and scope of his employment. Tenn. Code Ann. § 50-6-102(14)(A). This required a showing by a preponderance of the evidence that his "employment contributed more than fifty percent (50%) in causing the injury, considering all causes." Tenn. Code Ann. § 50-6-102(14)(B). For the reasons that follow, we conclude Employee's proof was insufficient to establish this causal link, and, therefore, he failed to meet his burden of establishing the compensability of the injury at C5-6 by a preponderance of the evidence.

Dr. Neely testified consistently with his written report, stating it was his "*feeling* that both of these injuries at C5-6 and at C6-7 *stem from* the workplace injury," adding that he was "truly not sure how one would be able to clearly separate which injuries were from the time span when the history placed them both as having been *secondary to* the injury." (Emphasis added.) Dr. Neely further testified he was "just *unable to tell* whether one level was injured or two levels were injured in a person that has never had any symptoms in their neck prior to the injury." (Emphasis added.) He stated that prior to the work incident Employee "had neck trouble but it was subclinical and it did not produce pain and did not produce any limitation."

After describing his diagnosis to include "a large rupture with extruded fragment at C6-7 with left radiculopathy," and stating that "at C5-6 he had a large central and right-sided disc rupture and an arthritic level of a spondylitic level of his spine," Dr. Neely was asked his opinion "as to whether or not that diagnosis and those injuries were *related to* his work-related incident." (Emphasis added.) He responded, "I think [Employee] had a significantly spondylitic level which was documented in the . . . x-rays two days after the injury. Those things didn't come about in those previous two days. He had them, but they were subclinical, and after this injury they became clinical." He was asked his opinion "whether or not those injuries were *related to* the [work incident]" and testified he had "a hard time separating the two from a patient that had no symptoms to a patient that had bilateral symptoms after this injury." (Emphasis added.) When asked, "[s]o what is the answer to that [causation] question, in your opinion," he responded, "I think they're *related to* the injury," adding that his opinion was based on a reasonable degree of medical certainty; that is, his opinion that Employee's C5-6 condition was *related to* the work incident was based on a reasonable degree of medical certainty. (Emphasis added.)

Clearly, Dr. Neely was of the opinion that Employee's symptoms were "subclinical" before the work incident and "became clinical" after the incident. He

undoubtedly "related" Employee's C5-6 condition to the work incident and believed Employee's condition "stem[med] from" the work incident. However, he was not asked and did not offer an opinion addressing whether the aggravation of Employee's C5-6 condition arose primarily out of the employment, or whether Employee's C5-6 injury contributed more than 50% in causing the need for medical treatment. As we have stated previously,

> [w]e do not conclude that a physician must use particular words or phrases included in the statutory definition of "injury" to establish the requisite medical proof to succeed at trial. Thus, a physician may render an opinion that meets the legal standard espoused in section 50-6-102(14) without couching the opinion in a rigid recitation of the statutory definition. What *is* necessary, however, is sufficient proof from which the trial court can conclude that the statutory requirements of an injury as defined in section 50-6-102(14) are satisfied.

*Panzarella v. Amazon.com*, *Inc.*, No. 2015-01-0383, 2017 TN Wrk. Comp. App. Bd. LEXIS 30, at *14 (Tenn. Workers' Comp. App. Bd. May 15, 2017) (emphasis in original).

Here, the trial court identified the issue as "whether [Employee] suffered a compensable aggravation of his disc osteophyte condition at the C5-6 level of his spine." Stating that an employee can satisfy the burden of proving a compensable aggravation if expert medical proof shows the work accident "contributed more than fifty percent (50%) in causing the aggravation," the trial court concluded that Employee's "documentation of his complaints from his initial providers, Dr. Neely's testimony, and his own testimony" was sufficient to meet his burden. However, the trial court did not identify, nor do we find in the record, evidence expressing any measure of the contribution of the work incident to Employee's C5-6 condition beyond being "related to," having "stem[med] from," or being "secondary to" the work incident. Dr. Neely did not testify, either directly or indirectly, that Employee's work incident "contributed more than fifty percent (50%)" in causing an injury at the C5-6 level of Employee's spine.

Proof that a condition is "related to" an event, "stems from" an event, or is "secondary to" an event, while being material and relevant evidence, does not offer a measure of the "contribution" that the employment provided to the injury or to the need for medical treatment, and it does not indicate whether such contribution was "more than fifty percent (50%)." Dr. Neely was not asked to address the measure of contribution, and the fact that Employee's condition was "related to," "stem[med] from," or was "secondary to" the work incident gives no indication whether the employment contributed more or less than 50% in causing an aggravation of Employee's C5-6 condition or in causing the need for surgery at that level. In the context of Employee's C5-6 condition and the work incident, each of these descriptions is indicative of some

association or connection between the two, even causally, but none provides any measure of whether that association, connection, or cause is primary, principal, the most significant, or something less. Tennessee Code Annotated section 50-6-102(14) evidences a clear intent for the causal relationship to attain a specified level in order for an injury to "arise primarily out of the employment," providing that "[a]n injury 'arises primarily out of . . . the employment' only if it has been shown by a preponderance of the evidence that the employment contributed more than fifty percent (50%) in causing the injury, considering all causes." Likewise, an injury causes the disablement or the need for medical treatment "only if it has been shown . . . that it contributed more than fifty percent (50%) in causing" the disablement or need for medical treatment. Tenn. Code Ann. § 50-6-102(14)(C).

Accordingly, we hold that the proof fell short of establishing by a preponderance of the evidence the causal link between the February 26, 2016 work incident and the need for the C5-6 level surgery as contemplated in section 50-6-102(14). Employee failed to satisfy his burden of presenting expert medical proof that the work accident "contributed more than fifty percent (50%)" in causing an aggravation of his C5-6 condition. *See* Tenn. Code Ann. § 50-6-102(14)(A), (B); *Payne v. D & D Elec.*, No. E2016-01177-SC-R3-WC, 2017 Tenn. LEXIS 215, at *10 (Tenn. Workers' Comp. Panel Apr. 18, 2017) (holding that medical testimony that the workplace accident was at least part of the cause of the employee's medical problem was insufficient to satisfy the employee's burden of proof).[1]

The trial court's award of permanent partial disability benefits was calculated based on the 19% impairment rating assessed by Dr. Neely, which he testified included impairments resulting from injuries to Employee's cervical spine at C5-6 and C6-7. Dr. Neely agreed that the 5% impairment Dr. Kauffman assessed as a result of Employee's C6-7 injury was appropriate for that injury. Accordingly, we modify the award of permanent partial disability benefits to reflect an award based upon 5% whole body impairment or 22.5 weeks at the weekly rate of $851.40, for a total of $19,156.50. We also modify the trial court's award of medical benefits to require Employer to provide reasonable and necessary treatment for Employee's work injury, which does not include treatment for his C5-6 condition.

---

[1] The dissent correctly points out that Dr. Neely testified Employee's conditions "stem from" the work accident. As noted above, Dr. Neely also said the conditions were "related to" or "secondary to" the accident. While such testimony may have been sufficient prior to the 2013 Reform Act to carry the day for an injured worker, it is not sufficient today. As noted above, an injured worker is entitled to benefits "only if it has been shown by a preponderance of the evidence that the employment contributed more than fifty percent (50%) in causing the injury, considering all causes." Tenn. Code Ann. § 50-6-102(14)(B). Dr. Neely's testimony falls short of meeting this standard, as well as the standard in section 50-6-102(14)(A), i.e., shown to a reasonable degree of medical certainty that the aggravation arose primarily out of and in the course and scope of employment. *See* Tenn. Code Ann. § 50-6-102(14)(A).

## Conclusion

For the foregoing reasons, we affirm the trial court's determinations that Employee suffered a compensable injury to his cervical spine and is entitled to permanent partial disability benefits and medical benefits for such injury. We hold that Employee failed to establish that his employment contributed more than 50% in causing an aggravation to his cervical spine at the C5-6 level and reverse the trial court's determination in that regard. We modify the award of medical benefits to exclude benefits for treatment of Employee's cervical spine at the C5-6 level. We also modify the award of permanent partial disability benefits to reflect only the permanent impairment attributable to Employee's C6-7 injury, which is 5% to the whole body or 22.5 weeks of benefits at the weekly rate of $851.40, totaling $19,156.50. Finally, we certify as final the trial court's order as affirmed in part, reversed in part, and modified in part.



FILED
Sep 14, 2018
12:40 PM(CT)
TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD

**TENNESSEE BUREAU OF WORKERS' COMPENSATION**
**WORKERS' COMPENSATION APPEALS BOARD**

| | | |
|---|---|---|
| Roger Joiner | ) | Docket No. 2017-06-0343 |
| | ) | |
| v. | ) | State File No. 16021-2016 |
| | ) | |
| United Parcel Service, Inc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Joshua D. Baker, Judge | ) | |

---

**Dissent – Filed September 14, 2018**

---

Conner, J., concurring in part and dissenting in part.

While I agree with my colleagues that Employee is entitled to permanent disability benefits based on his C6-7 disc herniation, I disagree that the trial court erred in awarding permanent disability benefits arising from the adjacent C5-6 condition. Therefore, I would affirm the trial court's order in its entirety.

A trial court's determinations are entitled to a presumption of correctness, and we are to reverse or modify a trial court's decision only if the preponderance of the evidence is otherwise. Tenn. Code Ann. § 50-6-239(c)(7) (2017). In the present case, I believe the preponderance of the evidence supports the trial court's decision for several reasons.

First, there was no evidence suggesting that Employee had any prior injuries to his neck. Moreover, there was no proof Employee had experienced any prior symptoms related to his neck or right upper extremity or that he had sought medical treatment for his neck or right upper extremity prior to the work accident.

Second, it was undisputed that Employee suffered a compensable injury to his cervical spine when he was lifting mail bags at work. Employer accepted the compensability of the left-sided herniated disc at C6-7.

Third, Employee offered unrefuted testimony that the numbness and tingling he experienced in his right hand occurred immediately following the work accident, but was overshadowed by the symptoms around his left shoulder.

Fourth, medical records introduced during trial corroborated Employee's testimony. In Dr. Malcolm Baxter's March 9, 2016 report, he noted Employee "initially had pain and numbness in both arms from the neck." In a note from Middle Tennessee Occupational and Environmental Medicine dated March 25, 2016, the provider noted Employee suffered from pain in both arms, left greater than right.

Fifth, Dr. Neely testified that Employee's explanation of the development of his symptoms, and his initial complaints of numbness and tingling in both upper extremities, supported Dr. Neely's opinion that "both of these injuries at C5-6 and C6-7 stem from the workplace injury." With respect to the employee's degenerative condition at the C5-6 level, Dr. Neely explained, "he had neck trouble but it was subclinical and it did not produce pain and did not produce any limitation." After the work accident, it "became clinical." Dr. Neely further testified that he "had a hard time separating the two [conditions] from a patient [who] had no symptoms to a patient [who] had bilateral symptoms after this injury." Finally, Dr. Neely concluded Employee suffered a "large central and right-sided disc rupture and . . . a spondylitic level [at C5-6] of his spine." He then concluded, "I think they're related to the injury."

We have previously concluded that "a physician may render an opinion that meets the legal standard espoused in section 50-6-102(14) without couching the opinion in a rigid recitation of the statutory definition." *Panzarella v. Amazon.com, Inc.*, No. 2015-01-0383, 2017 TN Wrk. Comp. App. Bd. LEXIS 30, at *14 (Tenn. Workers' Comp. App. Bd. May 15, 2017). "What *is* necessary," we continued, "is sufficient proof from which the trial court can conclude that the statutory requirements of an injury as defined in section 50-6-102(14) are satisfied." *Id.*

In the present case, Dr. Neely's arguably strongest statement was that both conditions "stem from" the workplace injury. Merriam Webster defines "stem from" as "to be caused by." Merriam-Webster Dictionary, https://www.merriam-webster .com/dictionary/stem from (last visited September 11, 2018). In the absence of any evidence of another cause of the symptoms Employee experienced in his right upper extremity immediately following the accident, I conclude that a fair reading of Dr. Neely's statements, when considered in the context of his testimony as a whole, was that the C5-6 symptoms and resulting disability arose primarily from the workplace accident.

Moreover, although I acknowledge that any of the factors noted above, standing alone, likely would not meet the legal standard espoused in Tennessee Code Annotated section 50-6-102(14), I conclude the totality of the evidence presented to the trial court was sufficient to support the trial court's determination, and the preponderance of the evidence does not overcome the presumption of correctness to which the trial court's decision was entitled. I therefore dissent with respect to that aspect of the majority's opinion.



**FILED**
**Sep 14, 2018**
**12:40 PM(CT)**
**TENNESSEE**
**WORKERS' COMPENSATION**
**APPEALS BOARD**

### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Roger Joiner | ) | Docket No.  2017-06-0343 |
| | ) | |
| v. | ) | State File No.  16021-2016 |
| | ) | |
| United Parcel Service, Inc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Joshua D. Baker, Judge | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 14th day of September, 2018.

| Name | Certified Mail | First Class Mail | Via Fax | Fax Number | Via Email | Sent to: |
|---|---|---|---|---|---|---|
| **Jason Denton** | | | | | X | jdenton@rma-law.com |
| **Brett Rozell** | | | | | X | brozell@rma-law.com |
| **David T. Hooper** | | | | | X | dhooper@hooperzinn.com |
| **Joshua D. Baker, Judge** | | | | | X | Via Electronic Mail |
| **Kenneth M. Switzer, Chief Judge** | | | | | X | Via Electronic Mail |
| **Penny Shrum, Clerk, Court of Workers' Compensation Claims** | | | | | X | Penny.Patterson-Shrum@tn.gov |

Matthew Salyer

Matthew Salyer
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov