

**FILED**
**Feb 16, 2024**
**01:16 PM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT NASHVILLE

| | | |
|---|---|---|
| **William Tucker,** | ) | **Docket No. 2023-06-01704** |
| **Employee,** | ) | |
| **v.** | ) | |
| **LU, Inc.,** | ) | **State File No. 44728-2022** |
| **Employer,** | ) | |
| **And** | ) | |
| **Bridgefield Cas. Ins. Co.,** | ) | **Judge Kenneth M. Switzer** |
| **Carrier.** | ) | |

---

## EXPEDITED HEARING ORDER GRANTING BENEFITS

---

In this multi-faceted case, William Tucker asked that the Court order his employer, LU, Inc., to pay temporary disability benefits after unauthorized neck surgery. He also asked that the Court designate the surgeon who performed the procedure, Dr. Margaret MacGregor, as the authorized treating physician for future treatment.

LU opposed his requests, asserting that the surgery was neither work-related nor medically necessary. But its central contention was that Mr. Tucker was not referred to Dr. MacGregor by another treating physician, so she should not be named the authorized treating physician.

After a February 6, 2024 expedited hearing, the Court holds that the surgery was work-related and reasonably necessary, so Mr. Tucker is entitled to temporary disability benefits after the procedure. In addition, a valid referral was made, and Dr. MacGregor is the authorized treating physician.

### Claim History

*The work incident and lay testimony*

Before the work injury, Mr. Tucker underwent an anterior cervical discectomy and fusion, or "ACDF," performed by Dr. MacGregor in October 2021. The doctor implanted

1

hardware during the procedure. By January 2022, Mr. Tucker returned to full-time, full-duty work at LU. He testified that he had no neck pain when he returned to work.

On June 24, 2022, Mr. Tucker was unloading a truck at work when he lost his footing and fell, injuring his neck, back, and ribs. LU offered a panel, and Mr. Tucker started authorized treatment at a clinic. He treated conservatively until late August. At his final visit, he was referred for specialized treatment.

LU offered several panels, one of which included Dr. Daniel Burval. At some point, Mr. Tucker asked the adjuster to see Dr. MacGregor but saw Dr. Burval instead. Although Mr. Tucker never returned a signed panel memorializing that choice, he saw Dr. Burval once before returning to Dr. MacGregor, believing he had a referral. Mr. Tucker denied that he requested to see Dr. MacGregor and maintained Dr. Burval referred him.

Dr. MacGregor ultimately performed another fusion surgery in November 2023.

Mr. Tucker testified that he worked without difficulty before the fall. Afterward, he felt pain in his neck and other body parts. He continued working despite those symptoms, saying, "I did the best I can at work." Mr. Tucker also testified that he had trouble sleeping and "couldn't do a lot at home like I usually do." His symptoms improved after the second surgery, although he still experiences occasional, sharp pain in his neck and arms, and he remains treating with Dr. MacGregor. He has not worked since the surgery.

*Post-fall specialist treatment/evaluation*

At Mr. Tucker's first visit with Dr. Burval in September 2022, Mr. Tucker told him about the previous surgery with Dr. MacGregor and his work accident. Dr. Burval took x-rays and noticed "a little bit of back out of 1 of the caudal screws" from the 2021 surgery. He did not have previous x-rays, however, for comparison. Dr. Burval did not recommend surgery. He wrote, "I will contact Worker's Comp to see that he can be seen by his treating surgeon[.]" Dr. Burval noted that Dr. MacGregor should compare past and current diagnostic test results "to see if there is [sic] any anatomical changes. He concluded that he "highly recommended *evaluation and treatment* by treating spine surgeon. *I wish him all the best.*" (Emphasis added).

At Mr. Tucker's first post-injury visit with Dr. MacGregor, which LU authorized, she compared x-rays taken after his fall with his pre-injury x-rays and noticed changes to his hardware. Dr. MacGregor wrote:

> I reviewed his cervical spine x-rays that were completed at TOA [after the fall], and compared those to his last images performed at the hospital as part of routine follow up after his ACDF. He has a clear change in position of his

2

hardware, with some backing out of one of his screws, and fracture through his fusion mass at both levels, and his plate is anteriorly displaced when compared with imaging performed previously, now evident also subtle listhesis at C45 and C56.

Later that month, a claims adjuster sent Dr. MacGregor a letter asking several detailed causation questions, and Dr. MacGregor's responded that she "agreed" that the fall at work was the cause of his neck pain and changes to his hardware. She further agreed that "the neck pain with left arm pain Mr. Tucker is experiencing is due to the backing out of the caudal screw." Dr. MacGregor disagreed that Mr. Tucker's condition was "at least 50% related to pre-existing issues," noting that "patient [was] without complaints and working fulltime fullduty [sic] at time of injury."

After a CT scan in January 2023, Mr. Tucker returned to Dr. MacGregor with worsening neck pain, and Dr. MacGregor recommended surgery. She noted that she disagreed with a radiologist's interpretation of CT images and wrote that Mr. Tucker had "hardware failure after a work related injury, and has developed progressive change in position of his hardware from his pre-fall (i.e. pre work -related injury) postopimaging."

LU requested utilization review, and the reviewing physician concluded that the surgery was not necessary. Mr. Tucker appealed to the Bureau's medical directors, who upheld the denial. They wrote that Dr. MacGregor should confer with the radiologist to discuss the CT scan results and issue a joint amended report, followed by a new treatment plan.

After the utilization review in April, Dr. MacGregor wrote a letter stating that after the original ACDF in 2021, Mr. Tucker sustained a new injury while working in June 2022. X-rays after the fall showed "a definite change in the position of the hardware. There is greater than 50% certainty that this is due to the work injury[.]"

Around that same time, Mr. Tucker asked LU to authorize another visit with Dr. MacGregor, so she could follow the medical directors' instructions. LU declined. It asserted that Dr. Burval was the authorized treating physician, and Mr. Tucker should return to him instead.

Mr. Tucker complied and saw Dr. Burval in May, who also reviewed the CT images from January and noticed the hardware changes. He wrote that the CT showed "the LEFT C-6 screw is loose (lucency) with collapse through the endplate into the C6-7 spondylotic disc space. The RIGHT C6 screw is backed out about 2 mm but has not penetrated the endplate or disc space. The 5-6 cage is pushed down into the C6 endplate consistent with endplate collapse."

3

Dr. Burval also questioned his further involvement in the case, and he gave an opinion on causation and the need for surgery. He wrote that he did not know why the "original spine surgeon" was not allowed to treat Mr. Tucker, and he planned to request digital copies of x-rays taken after the fall to verify if changes in his spine occurred after the work incident. He concluded, "*Once these pre-fall x-rays are confirmed to be his, it will be with a reasonable degree of medical certainty that the implant/hardware failure/loosening was more than 50% related to the reported work related fall in [June] 2022 and a revision of his C4-6 anterior instrumentation and fusing C6-7 is medically sound and indicated.*" (Emphasis in original). On a WorkLink Physician Report, Dr. Burval wrote, "Patient must follow up with Dr. MacGregor as his treating physician." The report also stated that Mr. Tucker may return as needed and "[n]o follow up [appointment] required."

Mr. Tucker's attorney sent a letter to Dr. Burval in June clarifying if he made a referral for Mr. Tucker to see Dr. MacGregor as his treating physician for the work-related June 2022 accident. He responded "yes" and explained that "[p]ost 6/24/22 x-rays show hardware collapse[.]"

Counsel forwarded the letter to LU's attorney in July, who responded by sending a panel of specialists that did not include Dr. MacGregor. Mr. Tucker declined to select a physician from the list.

Around that same time, Mr. Tucker's attorney sent a letter requesting Dr. MacGregor's opinions on causation and the proposed surgery. Counsel asked, "Is it your opinion within a reasonable degree of medical certainty that the neck surgery you recommended for Mr. Tucker is medically necessary and 51% or more related to his work accident on June 24, 2022 while employed with LU, Inc.?" Dr. MacGregor checked "yes."

In late July, Mr. Tucker attended an employer's examination with Dr. Douglas Mathews, who concluded that his condition did not relate to the fall and that surgery was unnecessary. Rather, he attributed his symptoms to Mr. Tucker's preexisting condition. He acknowledged loosening and backout of the C6 screw, but it "caused an exacerbation of a pre-existing condition and not an aggravation." Specifically, Dr. Mathews wrote: "To a reasonable degree of medical certainty, Mr. Tucker's 06/24/2022 injury caused an exacerbation of his history of chronic cervicalgia and non-verifiable cervical radicular complaints. Therefore, his current cervical spine condition, which does not require surgical intervention, is less than 50% related to his 06/24/2022 work injury."

In August, Mr. Tucker requested an evidentiary hearing seeking an order that LU authorize surgery. The parties deposed Drs. MacGregor and Mathews in preparation for the hearing.

Dr. MacGregor testified that her opinions had not changed regarding causation and the necessity of surgery since the June letter. She stated: "[I]t's more likely than not . . . 51 percent or greater, that his condition was caused by the fall. I would say that absent the fall, I would not have expected this condition of his cervical spine."

As for Dr. Mathews, his opinions were somewhat inconsistent. On direct examination, he testified as follows:

Q: Would you agree or disagree that if Mr. Tucker would need surgery in the future, that that need for surgery was not caused by the June 24th, 2022, injury?

A: I agree. I think it's way more likely than not that it would not. Is it possible that the screw could back out further? It could, but it's not likely to. And that would be an indication. If there's motion of—further migration of the screw, then that would be an indication for surgery. And that would be related to the injury.

On redirect, Dr. Mathews agreed that Mr. Tucker's current need for medical treatment was "primarily due to the pre-existing condition of his spine." He added that, in the "rare circumstance" that the screw migrated further, that would be a consideration for surgery.

The parties did not depose Dr. Burval, but they sent him another letter seeking his opinions. He disagreed that his recommendation to return to Dr. MacGregor related to spine treatment occurring before the work injury, noting "[p]t has collapsed hardware after 6/24/2022 fall." He wrote that he was not declining to treat Mr. Tucker.

Mr. Tucker sought emergency treatment in late October. He underwent further diagnostic testing, which revealed "[q]uestioned loosening of the right C6 screw which was not definitely present on prior CT or radiographs." Dr. MacGregor wrote a few days later, "[S]crew position on 10/30 chest x-ray has changed position/unscrewed since last images."

On November 8, the morning of the date of the scheduled expedited hearing, Mr. Tucker's counsel notified the Court that Dr. MacGregor had recommended emergency surgery, so the hearing was continued. That same day she performed a second ACDF, finding that the right C6 screw was not engaged in the plate any longer and was protruding a distance of over eight millimeters.

After the surgery in January 2024, Mr. Tucker's attorney sent another letter to Dr. MacGregor seeking her opinions on causation and the necessity of the ACDF. Counsel asked whether it was her opinion within a reasonable degree of medical certainty that the surgery she performed on November 8, 2023, was medically necessary and 51% or more

related to his work accident. Dr. MacGregor responded "yes." Counsel additionally asked whether Mr. Tucker was taken off work or given restrictions since the surgery. Dr. MacGregor checked "off work."

## Findings of Fact and Conclusions of Law

Mr. Tucker must prove a likelihood of prevailing at a hearing on the merits that he is entitled to the requested benefits. Tenn. Code Ann. § 50-6-239(d)(1) (2023); *McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Mar. 27, 2015).

### *The surgery*

The threshold question is whether Mr. Tucker's neck condition and need for treatment are related to the work incident, as Dr. MacGregor and Dr. Burval believe, or preexisting chronic cervicalgia and non-verifiable cervical radicular complaints, as Dr. Mathews believes.

Section 50-6-102(12) defines an "injury" as one that "arises primarily out of and in the course and scope of employment," resulting in "disablement or the need for medical treatment." Further, an employee must show "to a reasonable degree of medical certainty that [the work incident] contributed more than fifty percent (50%) in causing the . . . disablement or need for medical treatment, considering all causes." "Shown to a reasonable degree of medical certainty" means that, in the opinion of the treating physician, it is more likely than not considering all causes as opposed to speculation or possibility. *Id.* at -102(12)(A)-(D). Moreover, section 50-6-204 requires an employer to furnish reasonable and necessary treatment for all conditions that fall within the above definition of "injury."

Here, three well-qualified specialists have seen Mr. Tucker, examined him, and considered diagnostic test results from before and after the fall at work.

But of all of them, Dr. MacGregor's opinion, mirrored by Dr. Burval's, is the most persuasive regarding causation for several reasons.

First, Dr. MacGregor followed Mr. Tucker's progress for three months after the initial surgery in 2021. She saw him twice after the work accident before the second ACDF and has seen Mr. Tucker once afterward. Longstanding Tennessee case law states, "It seems reasonable that the physicians having greater contact with the Plaintiff would have the advantage and opportunity to provide a more in-depth opinion, if not a more accurate one." *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 677 (Tenn. 1991).

Second, Dr. MacGregor reviewed the chest x-ray taken immediately before the emergency surgery; Dr. Mathews did not. While performing the surgery, she directly observed the condition of his hardware, documenting that the screw had migrated substantially. Where a physician had the benefit of seeing the employee's condition, confirming pre-operative diagnoses, and that doctor had followed the employee as a patient and saw a lack of progress with conservative care firsthand, the trial court correctly accepted that physician's testimony as to medical necessity and the primary cause of the need for additional surgery. *Smith v. Trustpoint Hosp., LLC,* 2021 TN Wrk. Comp. App. Bd. LEXIS 1, at *21 (Jan. 6, 2021).

Third, Dr. MacGregor expressed her opinion repeatedly and with great certainty. She first believed that Mr. Tucker's condition was caused by the fall at the November 2022 visit and has staunchly maintained that position since. At her deposition, she explained her disagreement with almost every one of Dr. Mathews's enumerated conclusions. She did not waver on her position despite vigorous cross-examination. She repeated that opinion in her response to the January 2024 causation letter. This is the most recent of all of the opinions given in this case.

Fourth, Dr. Burval backed her initial conclusion at the May 2023 visit. He noted, "[I]t will be with a reasonable degree of medical certainty that the implant/hardware failure/loosening was more than 50% related to the reported work related fall in [June] 2022[.]" He repeated this in the September 2023 causation letter. Dr. Burval also had the advantage of seeing Mr. Tucker twice for treatment.

Dr. Mathews wrote a detailed report and thoroughly explained how he reached his conclusions during his deposition. Occasionally his testimony was somewhat contradictory, however. And it bears repeating that he saw Mr. Tucker once, for approximately one hour, and for purposes of an examination, while the other doctors saw him more often and for treatment.

Weighing all of the above, the Court finds that Drs. MacGregor and Burval gave the more plausible explanation—that the June 2022 fall at work was the primary cause for Mr. Tucker's need for surgery. He is likely to prevail at a hearing on the merits that the surgery was related to the fall at work.

As for medical necessity, again, Dr. MacGregor frequently said the surgery was warranted. Dr. Burval echoed this at Mr. Tucker's last visit with him, writing that "a revision of his C4-6 anterior instrumentation and fusing C6-7 is medically sound and indicated." Mr. Tucker, for his part, credibly testified to disabling neck pain before the second procedure that improved afterward. "The Supreme Court has consistently held that an employee's assessment as to his or her own physical condition is competent testimony that is not to be disregarded." *Limberakis v. Pro-Tech Sec., Inc.*, 2017 TN Wrk. Comp. App. Bd. LEXIS 53, at *7 (Sept. 12, 2017).

Four experts disagreed on the surgery's medical necessity. But even Dr. Mathews acknowledged that in the "rare circumstance" that the screw migrated further, that would be a consideration for surgery. And although the utilization review doctor and the medical directors disputed the medical necessity of the proposed surgery, again, they based their opinions on record reviews only that were very early in the process and without information about the substantial movement of the questioned screw. Dr. MacGregor actually observed the movement of the screw during the procedure. Thus, the Court similarly finds that the surgery was medically necessary and reasonable to treat Mr. Tucker's work-related condition. He is likely to prevail at a hearing on the merits on this issue, too.

*Benefits*

Given the previous rulings, the question becomes to which benefits Mr. Tucker is entitled.

First, he seeks temporary total disability benefits beginning after the November 8 2023 surgery. To qualify for temporary total disability benefits, "an employee must establish: (1) that he or she became disabled from working due to a compensable injury; (2) that there is a causal connection between the injury and the inability to work; and (3) the duration of the period of disability." *Smith,* at *21-22.

Applying this framework, the Court finds that Mr. Tucker became disabled from work due to the need for treatment—surgery—caused primarily by the fall at work. The treatment is causally connected to his inability to work. Dr. MacGregor wrote in a January 2024 letter that she took Mr. Tucker off work after the November 8 procedure. He remains off work. The Court finds he is likely to prevail at a hearing on the merits that he is entitled to these benefits.

Therefore, the Court holds that LU must pay temporary total disability of $13,698.12, from November 8 through the date of the expedited hearing. In addition, LU must pay weekly benefits in the amount of $1,065.41 until Mr. Tucker "reaches [maximum medical improvement] or is able to return to work." *Smith,* at *22.

The more difficult question deals with medical benefits; which doctor should continue to provide authorized treatment?

Mr. Tucker argued that Dr. MacGregor became his authorized physician as early as October 2023, when Dr. Burval referred him to Dr. MacGregor. Mr. Tucker contended that Dr. Burval made two later direct referrals as well, in May and June 2023. LU disagreed, maintaining that no referral was made, so Dr. Burval remains the authorized treating physician.

8

Section 50-6-204(a)(3)(A)(ii) states, "When necessary, the treating physician selected in accordance with this subdivision (a)(3)(A) shall make referrals to a specialist physician, surgeon, or chiropractor."

LU argued that the phrase "when necessary" means that "not all referrals transfer ATP status, only necessary referrals." According to LU, because Dr. Burval remained willing to treat Mr. Tucker, this referral was not "necessary." It cited *Ledford v. Mid-Georgia Courier, Inc.,* 2018 TN Wrk. Comp. App. Bd. LEXIS 28 (June 4, 2018).

LU's reliance is misplaced. In *Ledford,* an authorized treating physician similarly did not use the words "refer" or "referral" in the medical records. Among the doctor's observations were that he "felt he had nothing further to offer," and a "second opinion" physician would, "if appropriate, have the option to assume Employee's care." *Id.* at *7. In ruling that he made a referral, the Board did not conclude that an authorized treating physician *must* have no additional treatment to offer for a valid referral to be made, as LU suggests. Rather, the Board simply held, in a memorandum opinion, that under those particular circumstances, the authorized physician made a referral, considering the doctor's statements as a whole to discern his intention—to transfer care. Notably, the Board did not examine the meaning of the phrase "when necessary" in its discussion.

In the alternative, LU contended that no referral took place because Dr. Burval did not intend to refer Mr. Tucker for "treatment" but merely for Dr. MacGregor to compare past and current diagnostic test results "to see if there is [sic] any anatomical changes."

The plain language of section 50-6-204(a)(3)(A)(ii) does not state that a referral must be made for "treatment." LU argued that *Tapley v. National Transport,* 2017 TN Wrk. Comp. App. Bd. LEXIS 64 (Oct. 19, 2017) stands for this proposition. In *Tapley,* the Board concluded that when an authorized treating physician recommended a "consult" with another physician to confirm his diagnosis, "he did not intend, as of that date, to end active treatment or transfer Employee's care to another physician." Therefore, no referral was made under subsection 204(a)(3)(A)(ii). *Id.* at *7-8. As in *Ledford,* the Board looked to the authorized doctor's intentions and considered his statements as a whole. The Board did not hold that a referral must be made for "treatment."

But even if the Board had reached that conclusion, Mr. Tucker pointed out that Dr. Burval also wrote: "I will contact Worker's Comp to see that he can be seen by his treating surgeon[,]" and he "highly recommended *evaluation and treatment* by treating spine surgeon. *I wish him all the best.*" (Emphasis added).

The Court agrees that these statements are compelling proof of Dr. Burval's intent. He specifically called for "evaluation and treatment" by Dr. MacGregor and concluded with well wishes—words typically expressed when parting company, i.e. ending his treatment. In sum, the entirety of this record suggests that Dr. Burval intended to transfer

Mr. Tucker's care in October 2022. He made a direct referral to another specialist as contemplated by the statute at that time.

LU apparently agreed, albeit briefly, since it authorized a visit with Dr. MacGregor in November. Notably, it was not until she recommended surgery that LU started to question whether a valid referral took place and if she was the authorized treating physician.

On LU's insistence that she was not the authorized physician, Mr. Tucker returned to Dr. Burval in May 2023. At that visit Dr. Burval questioned why the carrier had not permitted further treatment with Dr. MacGregor. He also wrote on a WorkLink Physician Report, "Patient must follow up with Dr. MacGregor as his treating physician." His meaning is unequivocal.

Presumably to allay any lingering doubts, in June Mr. Tucker sent Dr. Burval a letter asking about his intentions, which he made crystal clear in his response. Mr. Tucker's attorney asked if he made a referral for Mr. Tucker to see Dr. MacGregor as his treating physician; he responded "yes."

LU argued that it did not receive a copy of his response to this letter until mid-July, and upon its receipt, it offered a panel within two days—therefore, it complied with the law. *See* Tenn. Code Ann. § 50-6-204(a)(3)(A)(ii) (employer is deemed to have accepted a direct referral, unless within three business days it provides the employee a panel of three specialists).

This argument is disingenuous. As discussed above, LU knew or should have known from the entirety of Dr. Burval's records in October and May that he made a direct referral to Dr. MacGregor. This panel was too late, and Mr. Tucker was not obligated to choose a specialist from it.

The Court is also unpersuaded by LU's assertion that Mr. Tucker asked Dr. Burval to refer him to Dr. MacGregor and that Dr. Burval did so to "appease" him. Mr. Tucker testified, without contradiction, that he did not ask that of Dr. Burval, merely the adjuster. But even if Mr. Tucker had asked Dr. Burval to return him to Dr. MacGregor, it strains credulity to assert that the doctor would do so without exercising his independent medical judgment to make the referral. Importantly, LU cited no case law to support this argument.

Rather, the Court deems LU to have accepted Dr. Burval's direct referral to Dr. MacGregor from its inaction in both October 2022 and May 2023. Therefore, the Court finds that Mr. Tucker has satisfied his burden and is likely to prevail at a hearing on the merits that Dr. Burval referred him to Dr. MacGregor. The Court designates her as the authorized treating physician for future treatment.

As to the remaining matters, the parties argued extensively about who is responsible for payment of the surgery. Mr. Tucker submitted bills for past unauthorized treatment with Dr. MacGregor. However, they were not admitted into evidence. *See Eaves v. Ametek,* 2018 TN Wrk. Comp. App. Bd. LEXIS 53, at *8 (Sept. 14, 2018) (Medical bills must be accompanied by proof that they are "reasonable, necessary, [and] causally-related to the work accident" to be admissible). The Court cannot order their payment at this time. Likewise, the Court will not rule on Mr. Tucker's request for attorney's fees at this time. *See Thompson v. Comcast,* 2018 TN Wrk. Comp. App. Bd. LEXIS 1, at *29 (Jan. 30, 2018) (A decision to award attorney's fees at an interlocutory stage of a case should be made only in extremely limited circumstances). Mr. Tucker may raise both issues at the compensation hearing.

Finally, Mr. Tucker requested that the Court refer LU to the Compliance Program for the potential imposition of penalties. LU raised a vigorous defense. But at this time, the Court finds no grounds for a referral and declines.

IT IS THEREFORE ORDERED:

1. LU shall pay past temporary total disability in a lump-sum totaling $13,698.12, from November 8 through the date of the expedited hearing. In addition, LU must pay weekly benefits in the amount of $1,065.41 until Mr. Tucker reaches maximum medical improvement or is able to return to work. Mr. Tucker's counsel is entitled to 20% of these awards as attorney's fees.

2. LU shall furnish additional treatment with Dr. MacGregor as the authorized treating physician.

3. The Court defers ruling on Mr. Tucker's requests for payment of past medical bills and attorney's fees.

4. A status hearing is set for **April 29, 2024, at 9:15 a.m. Central Time.** You must call 615-532-9552 or 866-943-0025 to participate.

5. Unless an interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3). The Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the seventh business day after entry of this Order. Failure to submit confirmation within seven business days may result in a penalty assessment for non-compliance. For questions regarding compliance, contact the Workers' Compensation Compliance Unit via email at WCCompliance.Program@tn.gov.

**ENTERED February 16, 2024.**


_____

**JUDGE KENNETH M. SWITZER**
**Court of Workers' Compensation Claims**

**Appendix**

Technical Record

1. Petition for Benefit Determination
2. Dispute Certification Notice and additional issues from both parties
3. Hearing Request
4. Employer's Objection to Employee's Request for an Expedited Hearing
5. Status Hearing Order
6. Employer's Motion to Extend Deadline for Submission
7. Employee's Response
8. Employer's Pre-Expedited Hearing Statement
9. Employer's Witness and Exhibit List
10. Order (Granting Extension)
11. Employer's Pretrial Brief for Expedited Hearing and attachments
12. Employee's Expedited Hearing Brief
13. Employer's Witness and Exhibit List, October 31, 2023 (Amended)
14. Employee's Witness and Exhibit List
15. Employer's Motion in Limine
16. Employee's Motion to Extend
17. Employer's Response
18. Notice of Appearance
19. Employee's Reply
20. Order Continuing Expedited Hearing
21. Amended Employee's Witness List
22. Employer's Supplemental Witness and Exhibit List
23. Employer's Amended Pretrial Brief for Expedited Hearing
24. Employee's Amended Expedited Hearing Brief


Evidence

1. Declaration of William Tucker
2. Joint Medical Proof
3. Wage Statement
4. Deposition Transcript, Dr. MacGregor
5. Deposition Transcript, Dr. Mathews
6. Employee's Updated Table of Contents of Medical Records
7. Dr. MacGregor letter, response dated January 19, 2024
8. Employee's Attachments to Brief, Winter 2024
9. Employer's Attachments to Briefs, Fall 2023 and Winter 2024

**CERTIFICATE OF SERVICE**

I certify that a copy of this Order was sent as indicated on February 16, 2024.

| Name | Certified Mail | Regular mail | Email | Sent to |
|------|----------------|--------------|-------|---------|
| Julie Reasonover, employee's attorney | | | X | julie@reasonoverlaw.com kat@reasonoverlaw.com |
| Greg Fuller, Houston Gunn, employer's attorneys | | | X | ghfuller@mijs.com hgunn@mijs.com kaceicys@mijs.com |

_____

Penny Shrum
Clerk, Court of Workers' Compensation Claims
WC.CourtClerk@tn.gov

14



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury: _____**

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____     ☐ Motion Order filed on _____

☐ Compensation Order filed on_____     ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

_____

## Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____

*[Signature of appellant or attorney for appellant]*