**FILED**
**Jan 29, 2026**
**08:59 AM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT NASHVILLE

| | | |
|---|---|---|
| **Rafael Romero-Hernandez,** | ) | **Docket No. 2024-50-5318** |
| **Employee,** | ) | |
| **v.** | ) | |
| **Valley Interior Systems, Inc.,** | ) | **State File No. 16769-2024** |
| **Employer,** | ) | |
| **And** | ) | |
| **Cincinnati Casualty Company,** | ) | **Judge Kenneth M. Switzer** |
| **Carrier.** | ) | |

---

## EXPEDITED HEARING ORDER GRANTING MEDICAL BENEFITS

---

This complicated case requires the Court to assess witness credibility and to weigh conflicting medical opinions as to recommended surgeries.

Rafael Romero-Hernandez alleged that he injured his left knee while doing construction work, and initially Valley Interior Systems accepted the claim. He sought additional treatment—surgeries—for both knees, arguing that his right knee became injured as a direct and natural consequence of the first injury. Mr. Hernandez also argued that he is entitled to additional temporary disability benefits.[1]

Valley contended that another surgery for his left knee is not reasonable, necessary, or work-related, and that the right-knee condition is preexisting and unrelated to work. It also disputed his entitlement to additional disability benefits.

The parties obtained opinions from the authorized doctor, a utilization review physician, and an employer's examiner. The Court considered them along with testimony offered at an expedited hearing on January 13, 2026.

---

[1] The employee's preferred surname is Hernandez.

In sum, Mr. Hernandez is likely to prevail at a hearing on the merits that Valley must furnish treatment for his knees. However, he has not shown entitlement to temporary disability at this time.

## Claim History

*Lay testimony and the medical records*

On February 27, 2024, a heavy metal "boom" struck Mr. Hernandez's left knee while at work, causing it to hyperextend backward. He denied problems with either knee before this incident.

Mr. Hernandez first went to an occupational medicine clinic but later went to the emergency room due to "L knee was hit with stud and went backward." The nurse practitioner recommended a specialist.

Valley furnished treatment with panel physician/orthopedic surgeon Dr. Paul Thomas, whose March 6 notes stated, "[a] piece of metal hit the front of his [left] knee causing it to hyperextend backwards." Dr. Thomas wrote that he had no previous knee pain, and the notes do not mention a right-knee injury. He recommended an MRI, which showed meniscal tears in the left knee. Three weeks later, Dr. Thomas recommended surgery. An "adjuster" was present at that appointment. Dr. Thomas surgically repaired the tears in May.

The left-knee pain returned, so Dr. Thomas injected it in August. After another MRI showed both a meniscal tear and "moderate-to-severe degenerative changes," Dr. Thomas performed another surgery to repair the tear in October. Mr. Hernandez testified that after the procedure, he was non-weight-bearing, and his left knee felt "great."

Mr. Hernandez testified that even before the second surgery, he began experiencing pain in his right knee. According to Mr. Hernandez's declaration, Dr. Thomas said that was "normal due to favoring it during the treatment of [his] left knee." Mr. Hernandez continued with physical therapy in January 2025 and said that he felt a "pop" in his left knee at one of the sessions. As the left knee improved, his right-knee pain worsened.

Mr. Hernandez fell in a parking lot in late January when his right knee "gave out" immediately before the fall. He treated at an emergency room and was diagnosed with a right-knee sprain.

At a January 29, 2025 visit, Dr. Thomas saw Mr. Hernandez for post-operative follow up and "[r]ight knee problem." This was the first time the right knee is mentioned in authorized treatment.

Dr. Thomas wrote: "[H]e has been attending physical therapy and last week had a pop in his knee[.] . . . He states last Thursday, his right knee gave out on him and caused him to fall. . . . He reports his pain is worse on his right knee due to over compensating for his left knee." Dr. Thomas diagnosed tears of the left lateral and medial menisci and osteoarthritis in the left and right knee joints, as well as derangement of the right meniscus. Dr. Thomas wrote in the plan, "I suspect that his right knee pain is caused from his left knee due to overcompensation." He ordered an MRI for the right knee but noted that the carrier might not approve it.

Mr. Hernandez believed his authorized treatment was completed, so he treated both knees on his own afterward and paid out-of-pocket for MRIs of both knees. The February 12 imaging showed tears in both knees.

Mr. Hernandez then saw unauthorized providers for a second opinion on February 17, 2025, where he complained of "bilateral knee pain." The history states, "on 2/24/[24] he got hit with a metal bar on the left knee. He states right knee is painful as well on 1/25/[25] he fell because his knee buckled." The providers noted "osteoarthritis as the main culprit of his pain" and tearing in both knees. He underwent a left-knee injection.

Mr. Hernandez later underwent an authorized MRI of the right knee, which Dr. Thomas reviewed at a March 5 visit. Mr. Hernandez testified that Dr. Thomas saw tears and recommended surgery for both knees, but then a nurse case manager spoke with the doctor privately. When he returned, the doctor placed Mr. Hernandez at maximum medical improvement, assigned 4% impairment, and placed no work restrictions.

Valley did not offer proof from a nurse case manager, but its counsel acknowledged that one was assigned to the case.

Notes from this visit do not mention a nurse case manager and describe a different mechanism of injury than Mr. Hernandez originally gave. Specifically, it says that the left knee was hit by metal, causing it to hyperextend, but the metal "also struck his right knee some during this injury as well." The notes also state that both knees were previously injected. Mr. Hernandez denied that he told the doctor that he hurt his right knee in February 2024 and said he never had an injection in his right knee.

Dr. Thomas wrote the following:

> We have discussed in length that his left knee has recurrent degenerative meniscus tear due to his osteoarthritis that has gotten worse over the course of the last year due to his injury. He understands as well that this is the pop he felt in physical therapy and has caused his continued pain. He understands that he possibly had osteoarthritis prior to his injury that did not bother him but his injury did cause him to have increased pain, and now from having two separate surgeries, has caused his osteoarthritis to get worse; therefore, causing degenerative tears of his meniscus. We have discussed he could have another meniscus surgery but it will continue on the same path and would ultimately not correct the cause of the recurrent tears, which is his osteoarthritis.
>
> For his right knee, I suspect during his original injury and having no pain prior, he did sustain a lateral meniscus tear that has been gradually getting worse. Due to this being a work comp case, they will not approve for any more surgery at this time on either knee; however, I do recommend he have surgery on his right knee in regards to his meniscus tear. He states that he understands and does not agree with work comp not approving surgery but will be speaking with his attorney in regards to all of his options in his case. At this time I have discussed that he be at full in MMI and impairment rating knee completed on him. I will fill out a C-30A form as soon as possible. He is able to continue with his daily activities as his pain allows. He will follow up as needed.

He placed no work restrictions and wrote that Mr. Hernandez could return as needed.

Notes from Dr. Thomas dated March 30 say that he examined Mr. Hernandez that day. They repeat that Mr. Hernandez injured both knees in February 2024 and previously had injections in both knees. The report also says a C-30A was completed, but the signed document is dated May 28, 2025.

Mr. Hernandez said he only saw the doctor once in March 2025 and denied that he returned on March 30. He emphasized that a nurse case manager was involved in his care and was present during his examinations by the doctor. Mr. Hernandez did not return to Dr. Thomas for several months afterward, despite ongoing pain in both knees, because he believed his authorized treatment was completed. His temporary disability payments ended on March 6 after the maximum medical improvement pronouncement.

Valley sent Mr. Hernandez to see Dr. David West, an orthopedic surgeon, in May, for an employer's exam. Dr. West wrote, "I do feel that Mr. Hernandez likely reached [maximum medical improvement] for his compensable left knee injury on March 5." Dr. West did not relate the condition of the right knee and need for treatment to the work incident. Rather, he attributed the right-knee symptoms to a preexisting "combination of underlying degenerative joint disease and a knee strain."

Mr. Hernandez returned to Dr. Thomas on August 4, which notes repeat that he told the doctor both knees where injured on February 27. He denied telling Dr. Thomas this and suggested that perhaps the doctor wrote that because it was in the previous records.

The notes additionally state that Mr. Hernandez asked to undergo left-knee surgery. Dr. Thomas ordered the procedure, writing:

> We have discussed in length that his left knee has a recurrent degenerative meniscus tear due to his osteoarthritis that has gotten worse over the course of the last year due to his injury. He understands as well that this is the pop he felt in physical therapy and has caused his continued pain. The patient has tried and failed conservative treatment, including assistive devices,

4

cortisone injections, NSAIDS, and home exercises/physical therapy for at least 6 weeks.

As for the right knee, Dr. Thomas repeated that surgery was recommended but would not be approved by workers' comp. Dr. Thomas placed restrictions of "no driving, no squatting, no prolonged standing, and no lifting."

Mr. Hernandez's temporary disability benefits were reinstated on August 4. He receives $697.10 weekly.

Mr. Hernandez agreed that Valley offered work within his restrictions after he was placed at maximum medical improvement in March 2025. He earned no income for several months. Mr. Hernandez said he lives in Killen, Alabama, and the only available work was in the Nashville "shop." Under usual circumstances, this would be a two-hour drive one-way, but with his knee injury, Mr. Hernandez said he must take frequent breaks when driving, significantly prolonging the trip. He drove to attend the expedited hearing; the trip took four hours with four breaks.

Mr. Hernandez limped to take the witness stand and said he is in pain every day. He wants the surgeries. He was able to earn up to $1,500 per week before the accident. Mr. Hernandez said he wants to return to his previous health status and occupation.

*Utilization review*

Valley sent the (third) left-knee surgery recommendation to utilization review. In September 2025, the reviewing orthopedic surgeon denied the procedure. The physician explained that the ODG Guidelines recommend surgery when objective findings support the request; conservative treatment failed; and imaging shows "no knee osteoarthritis, minimal osteoarthritis or moderate osteoarthritis." However, in this case:

Details regarding previous conservative management including physical therapy, medication management and injection details are unclear. Additionally, the MRI provided from 9/3/2024 noted moderate to severe degenerative changes, and the provider noted in the plan that the individual's arthritis has worsened. It is unclear why an additional arthroscopy is indicated at this time given the individual's arthritis, persistent complaints despite 2 prior arthroscopies and given lack of details in regards to prior and recent conservative care.

The medical director agreed, stating, "Previous study 9/24 revealed degenerative changes that would not be amenable to further surgical intervention as an improvement over non-surgical management."

*Dr. West's deposition*

The parties deposed Dr. West in August 2025, before utilization review.

Dr. West began by explaining in lay terms the body part and condition at issue. Dr. West said that a knee meniscus "is essentially a soft tissue shock absorber on both sides of the knee, medial and lateral." "Osteoarthritis" means "bone inflammation," which "can cause irritation, tearing, pain, in different shear forces that go across it."

Dr. West testified that osteoarthritis could cause meniscus tearing: "I think it's a degeneration, meaning a dehydration, losing water in the cartilage, a breakdown of collagen over the years, a natural aging process."

Dr. West acknowledged that Mr. Hernandez said his right knee "gave out" before the fall in the parking lot in January 2025 but many causes could be responsible. They include leg or quad weakness, a ligament tear, or a meniscus injury, although a meniscus injury is not "typically [a] common reason for a knee to give out.· Maybe they're just responding to pain."

The doctor reviewed the MRI results and concluded that the right-knee problems were not acute, due to the presence of a discoid meniscus. He said that a discoid meniscus "is in no way, shape, or form an acute injury," and, "[a] preexisting problem with a horizontal tear is not uncommon for a discoid meniscus.· The free radial tear of the medial·meniscus does not mean it was a direct new injury." Dr. West added that radiologists typically interpret imaging without the benefit of performing a physical exam—"so it's hard for them to say it's an acute injury." The right-knee condition does not relate to work, and "it's much less than a 51 percent chance that it's acute," he said.

As to the left knee, Dr. West questioned the reasonable necessity of a third surgery, stating that he has rarely performed a third "scope" and only if another acute event occurred. He was not asked directly whether the left knee's current condition relates to work.

On cross-examination, Dr. West agreed that "compensation" by the other side might occur if a knee remains painful after surgery. He further agreed that "compensating" might result in new right-knee pain, but he added, "to go as far as to say that he got a tear of the discoid lateral meniscus and possibly a tear of the medial meniscus, I think, is going too far with that assumption."

After the first tear and surgery, the need for additional surgery becomes more likely. Dr. West explained, "It's like a potato chip that keeps cracking. ·. . . [T]he bottom line is when you kind of start buying a—a meniscus surgery, you know, it chips away, and

sometimes it continues. . . . [A]s you get older, that it becomes more brittle, the meniscus tears[.]"

*Dr. Thomas's deposition*

Dr. Thomas testified that the initial surgery was successful, and he recalled Mr. Hernandez telling him about hearing a "pop" in his left knee during physical therapy. He diagnosed a recurrent tear and surgically repaired it. Dr. Thomas agreed that up to that point, all treatment related primarily to the work incident and was reasonably necessary.

Dr. Thomas testified that Mr. Hernandez never complained of right-knee pain before the second surgery. He said that in March 2025, Mr. Hernandez began complaining of right-knee pain "due to overcompensation on his left knee and putting all his weight on his right." Dr. Thomas said it was "fairly common" for a patient who stops bearing weight on one knee to maybe put "more stress" on the other knee, resulting in "increased knee pain on the other side."

After the parking lot fall, Dr. Thomas said the MRIs showed tears in both knees. Dr. Thomas could not recall the presence of a nurse case manager at the March 2025 visit, when he assessed maximum medical improvement.

After that visit, Dr. Thomas responded to letters from Mr. Hernandez's attorney, giving opinions largely favorable to Mr. Hernandez.

The March 10, 2025 letter asked if his right-knee condition was a direct and natural consequence from the left-knee injury and treatment. Dr. Thomas circled "yes" and wrote: "favored left knee putting stress on right knee." He likewise circled "yes" to whether Mr. Hernandez needed right-knee treatment and was not at maximum medical improvement. He wrote, "Needs right knee surgery." He additionally wrote that Mr. Hernandez should be assigned work restrictions but did not specify them. Dr. Thomas testified that he still held these opinions.

In the June 24, 2025 letter, Dr. Thomas responded "yes" that Mr. Hernandez needed additional surgery in his left knee. He further agreed that the need for that surgery arose primarily out of work and that maximum medical improvement was premature. He testified that he agreed with those answers.

Dr. Thomas further testified that he disagreed with the utilization review denying the left knee surgery. He explained, "I have an MRI that says that he has a recurrent tear of the meniscus; and although it's been·two times, it still is torn, and I still think that's part of the etiology of his pain."

At the conclusion of his direct examination, the following exchange occurred:

Q.· [Y]ou believe that the need for the third treatment [surgery] is reasonable and necessary; is that right?
A.· Yes.
Q.· Do you believe that it's primarily related to the original work accident and subsequent treatment?
A.· Yes.
Q.· And regarding the right knee, do you believe that's a direct and natural consequence of the issue with his left knee?
A.· Yes.

On cross-examination, Dr. Thomas agreed that no one forced him to place Mr. Hernandez at maximum medical improvement in March 2025; rather, Mr. Hernandez himself said workers' compensation would not cover the surgery.

Dr. Thomas agreed that the February 2025 MRIs of both knees also showed arthritic and degenerative changes, and that the right-knee MRI revealed a "discoid meniscus." He explained that a discoid meniscus is congenital, not the result of an acute injury, and "prone to tearing." But he also said that the fall in the parking lot possibly tore the right-knee meniscus.

Dr. Thomas acknowledged Dr. West's opinion that the right-knee tear could have been caused by the discoid meniscus and does not relate to work. But he added that Mr. Hernandez:

[H]ad no trouble with his right knee prior to the fall.· He didn't have pain. ·Even before the first injury when he hurt his left knee, he didn't come in complaining that he had any trouble, to my knowledge, seeing anybody else for his right knee. So although Dr. West is—is right in that you can't say for sure, someone would have to explain to me why then he is now having right knee pain.

Dr. Thomas further explained the overcompensation in the right knee as follows:

[I]f anyone of us walked around for weeks putting all our weight on one knee when we would normally be walking on two, I would think most everybody would have—this is just based on years of experience—most everybody would start experiencing some pain in that—in that knee because it's been asked to do a lot more than it would normally be asked to do.

Dr. Thomas testified that Mr. Hernandez has both arthritis and a torn meniscus in the left knee, and it "now has become a degenerative meniscus where it got injured.· And now it's kind of—to use non-medical words, it's kind of crumbling away." He said he did

not know whether the arthritis or torn meniscus was more responsible for Mr. Hernandez's pain, but surgery might improve it. Dr. Thomas said the presence of both is common, and that the only way to know if the arthritis or the tear is causing the pain is to perform surgery.

When asked why he changed his opinion in the March letter after placing Mr. Hernandez at maximum medical improvement, Dr. Thomas said that he had done so in part because Mr. Hernandez said surgery would not be covered. As to work restrictions, Dr. Thomas said Mr. Hernandez can work a "sit-down job" with hourly breaks.

### Findings of Fact and Conclusions of Law

Mr. Hernandez must prove he is likely to prevail at a hearing on the merits that he is entitled to benefits. *McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Mar. 27, 2015); Tenn. Code Ann. § 50-6-239(d)(1) (2025).

#### *Factual disputes*

As an initial matter, the Court finds Mr. Hernandez credible, despite Valley's counsel's vigorous cross-examination. He appeared mostly calm, self-assured, steady, confident, forthcoming, reasonable, and honest. *See Kelly v. Kelly,* 445 S.W.3d 685, 694-95 (Tenn. 2014) (offering indicia of lay witness credibility). Further, "if minor and insignificant details vary, an injured worker should not be penalized simply for being a poor historian." *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 677 (Tenn. 1991).

Valley questioned his credibility on several points.

Starting first with the mechanism of injury, Mr. Hernandez was adamant that he only injured his left knee at work on February 27, 2024. The initial medical records, including Dr. Thomas's, confirm that Mr. Hernandez gave that history. For unknown reasons, Dr. Thomas's records changed to say Mr. Hernandez injured *both knees* starting in January 2025. Mr. Hernandez vehemently denied saying that in his testimony; Dr. Thomas's account was an unsworn medical record. The Court credits Mr. Hernandez's testimony and finds he did not tell Dr. Thomas that he injured both knees beginning in January 2025.

As for whether a nurse case manager played a role in the case, Mr. Hernandez again testified emphatically that she attended every visit, was present in the exam room, and had discussions with Dr. Thomas. Valley's counsel agreed that a nurse was involved but offered no proof on this point. Dr. Thomas testified that he could "not recall" the presence of a nurse case manager at the March 2025 visit. The Court credits Mr. Hernandez's

testimony and finds that a nurse case manager was indeed involved—and possibly to his detriment.[2]

Finally, the Court accepts Mr. Hernandez's testimony that he never underwent right-knee injections, disregarding Dr. Thomas's unsworn note to the contrary.

*Left-knee treatment*

Mr. Hernandez must show that the proposed surgery is both related to the work incident and reasonably necessary.

Turning first to causation, Mr. Hernandez must show that he suffered an injury arising primarily out of the course and scope of employment. Further, he must show that the injury to a reasonable degree of medical certainty contributed more than 50% in causing the need for treatment, considering all causes. In addition, the opinion of the panel-selected treating physician "shall be presumed correct on the issue of causation but this presumption shall be rebuttable by a preponderance of the evidence[.]" *Id.* § 50-6-102(12).

When medical testimony conflicts, a trial court may consider, among other things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts." *Orman,* 803 S.W.2d at 676.

Here, both experts are highly qualified, and both considered the same treatment records. But the circumstances of their examinations vary significantly. Dr. West saw Mr. Hernandez once for an employer's examination. Dr. Thomas saw him at least nine times over the course of 18 months, during which he performed two surgeries. This gives him a distinct advantage. "It seems reasonable that the physicians having greater contact with the Plaintiff would have the advantage and opportunity to provide a more in-depth opinion, if not a more accurate one." *Id.* at 677.

The phrasing of their opinions also differs greatly. In the June 24, 2025 letter, Dr. Thomas agreed that the need for the third surgery arose primarily out of work. He maintained that opinion at his deposition. Dr. Thomas was additionally asked whether he believes that the need for the third surgery is "primarily related to the original work accident and subsequent treatment." He said yes.

In contrast, Dr. West wrote in his report that Mr. Hernandez "likely reached MMI for his compensable left knee injury on March 5." But he did not say whether the need for

---

[2] The carrier is cautioned that Tennessee Compilation Rules and Regulations 0800-02-07-.04(2) (2025) states that a nurse case manager may not "[d]etermine whether the case is work related" or "[q]uestion the *physician . . . regarding issues of compensability."*

a third surgery arose primarily out of employment, or any words to that effect—in his report and during his deposition.

Further, "the Supreme Court has consistently held that an employee's assessment as to his or her own physical condition is competent testimony that is not to be disregarded." *Limberakis v. Pro-Tech Sec.,* 2017 TN Wrk. Comp. App. Bd. LEXIS 53, at *6 (Sept. 12, 2017). Mr. Hernandez credibly testified that he had no problems with his left knee before the work incident and that he now has daily pain. Moreover, the Court observed him limping as he took the stand.

Additionally, Dr. Thomas's opinion is presumed correct. The Court finds that Dr. West's causation opinion regarding the need for the left-knee surgery does not rebut the presumption.

As to the reasonable necessity of surgery, section 50-6-204(a)(3)(H) states that any treatment recommended by a panel physician is presumed medically necessary. An employer then "has the burden to overcome the presumption in favor of the medical necessity of the authorized physician's recommended treatment by a preponderance of the evidence." *Morgan v. Macy's,* 2016 TN Wrk. Comp. App. Bd. LEXIS 39, at *19 (Aug. 31, 2016).

Much of the same reasoning applies to this question. Dr. Thomas saw Mr. Hernandez several times; the utilization review doctor and medical director never saw him; and Dr. West saw him once. Dr. West did not give an opinion on the utilization review. He testified that he has rarely performed a third surgery on the same body part and only if another acute event occurred. He did not give a detailed explanation of why the procedure is not reasonably necessary.

Conversely, Dr. Thomas's records and testimony convey a stronger opinion as to why surgery is reasonable and necessary. When he first recommended it in August 2025, he wrote, "The patient has tried and failed conservative treatment, including assistive devices, cortisone injections, NSAIDS, and home exercises/physical therapy for at least 6 weeks." This statement addresses the "details" of conservative care that utilization review questioned. Then at his deposition, Dr. Thomas testified that the surgery was "reasonable and necessary."

His opinion is presumed correct, and the Court finds that Dr. West's opinion does not rebut the presumption. Valley must immediately authorize this surgery.

*Right-knee treatment*

A Tennessee Supreme Court Panel explained the "direct and natural consequence" rule as follows:

11

[A] subsequent injury, whether in the form of an aggravation of the original injury or a new and distinct injury, is compensable if it is the direct and natural result of a compensable injury. . . . As long as the subsequent injury that is alleged to be a natural consequence flowing from a compensable injury can be shown to have arisen primarily out of and in the course and scope of employment, it, too, will be compensable under the Reform Act. This requires a finding by a preponderance of the evidence that the employment contributed more than fifty percent in causing an injury subsequent to a compensable injury for it to also be compensable.

*Hudgins v. Global Pers. Sols. Inc.*, No. E2023-00792-SC-R3-W, 2024 Tenn. LEXIS 86, at *12-14 (Tenn. Workers' Comp. Panel Mar. 5, 2024).

Mr. Hernandez argued that he overcompensated and put additional weight on the right knee, causing it to "give way" so that he fell. He believed this event tore the right-knee meniscus.

Valley agreed that the left-knee injury and treatment were work-related until the third surgery was recommended. The Court has previously found that the left-knee condition arose out of employment.

Dr. West said the right knee "giving out" could have been due to many causes, including leg or quad weakness, a ligament tear, or a meniscus injury. The medical records, however, do not document any of these symptoms in the right leg before the fall in the parking lot. Dr. West did not address "overcompensation" but focused on the discoid meniscus, which is congenital, preexisting, and "in no way, shape, or form an acute injury." He concluded that the right-knee condition does not relate to work and "it's much less than a 51 percent chance that it's acute."

Meanwhile, Dr. Thomas has long related the right-knee condition and need for surgery to the left knee. In January 2025, after the fall in the parking lot, Dr. Thomas diagnosed a right knee derangement and wrote, "I suspect that his right knee pain is caused from his left knee due to overcompensation." He also explained overcompensation at his deposition, saying that "most everybody would start experiencing some pain" in a knee that's "been asked to do a lot more than it would normally be asked to do." This is entirely plausible.

After placing him at maximum medical improvement, Dr. Thomas answered a March 10 letter answering "yes" to a question repeating the legal standard, whether Mr. Hernandez's right-knee condition was "a direct and natural consequence from the left-knee injury and treatment." Dr. Thomas wrote: "favored left knee putting stress on right knee." He testified that he still held these opinions.

12

Dr. Thomas candidly agreed that the right-knee tear could have been caused by the discoid meniscus. But he pointed out that Mr. Hernandez had no pain or trouble with his right knee, and wasn't seeing any doctor for it, before the fall. He concluded, "So although Dr. West is—is right in that you can't say for sure, someone would have to explain to me why then he is now having right knee pain." Importantly, he said the only way to know if the arthritis or the tear is causing the pain is to perform surgery.

Again, this explanation is reasonable. Moreover, the Supreme Court has observed, "We have long recognized that in these cases absolute certainty on the part of a medical expert is not necessary to support a workmen's compensation award, for expert opinion must always be more or less uncertain and speculative." *Orman,* 803 S.W.2d at 676.

Mr. Hernandez credibly testified that he had no problems with this knee until the left-knee injury and treatment. Considering all the proof, the Court finds that Dr. West's opinion does not rebut the presumption of correctness afforded to Dr. Thomas. Mr. Hernandez is likely to prevail at a hearing on the merits in showing that his right-knee injury was the direct and natural consequence of treatment for the left-knee work injury.

*Temporary disability benefits*

Finally, Mr. Hernandez requested temporary partial disability benefits from March 6, 2025, after the maximum medical improvement pronouncement, until they were reinstated in early August.

Mr. Hernandez must show that Dr. Thomas returned him to work with restrictions before reaching maximum medical improvement that Valley could not or would not accommodate. *Jones v. Crencor Leasing and Sales*, 2015 TN Wrk. Comp. App. Bd. LEXIS 48, at *8 (Dec. 11, 2015). When an injured employee is released to return to restricted duty, and the employer makes a return-to-work offer that is declined by the employee, a court is to assess "the reasonableness of the employer in attempting to return the employee to work and the reasonableness of the employee in failing to return to work." *Francoeur v. Amerimed Med. Sols., LLC,* 2024 TN Wrk. Comp. App. Bd. LEXIS 36, at *9 (Oct. 1, 2024).

Here, the proof showed that on March 10, 2025, Dr. Thomas rescinded maximum medical improvement and placed unspecified work restrictions on Mr. Hernandez. At his deposition Dr. Thomas said Mr. Hernandez could do a "sit-down" job. Mr. Hernandez testified that the problem was mainly driving. He also testified, against his own interest, that Valley offered him work not in the field but in its office in Nashville. He declined because he lives in Alabama, and the drive would be difficult and time-consuming given the need for frequent breaks.

In *Francoeur*, the Appeals Board, under somewhat similar facts, wrote that no evidence showed driving to be "an essential function of the job," and "nothing in the workers' compensation statutes, regulations, or precedent mandat[es] that an employer provide an injured worker transportation to and from work in circumstances where the employee is restricted from driving due to a work-related injury but driving is not part of that employee's job." *Id.* at *12.

Therefore, the Court finds that Valley acted reasonably in offering Mr. Hernandez sit-down work in the office and was under no obligation to transport him there. The location of Mr. Hernandez's home was his choice. He has not shown on this record that he will likely prevail at a hearing on the merits that he is entitled to additional disability benefits.

IT IS ORDERED AS FOLLOWS:

1. Valley shall furnish treatment for Mr. Hernandez with Dr. Thomas for his left and right knees, including the recommended surgeries, under Tennessee Code Annotated section 50-6-204.

2. The Court denies Mr. Hernandez's request for additional temporary disability benefits at this time.

3. The Court sets a status hearing on **August 31 at 9:00 a.m. Central Time.** The parties must dial 615-532-9552 or 866-943-0025 to participate.

4. Unless an interlocutory appeal of the Expedited Hearing Order is filed, compliance with this order must occur no later than seven business days from the date of entry of this order under section 50-6-239(d)(3).

**ENTERED January 29, 2026.**

*Kenneth M. Switzer*
_____
**JUDGE KENNETH M. SWITZER**
**Court of Workers' Compensation Claims**

14

**Appendix**

Exhibits:

1. Rule 72 Declaration of Rafael Romero Hernandez
2. Deposition Transcript, Dr. Thomas, and exhibits
3. Deposition Transcript, Dr. West, and exhibits
4. Medical records
5. UR denial of left-knee surgery

## CERTIFICATE OF SERVICE

I certify that a copy of this Order was sent as indicated on January 29, 2026.

| Name | Email | Sent to |
|---|---|---|
| Adam Brock-Dagnan, employee's attorney | X | adam.brockdagnan@forthepeople.com<br>christopher.howell@forthepeople.com |
| Rosalia Fiorello, employer's attorney | X | rfe@chriseadslegal.com<br>assistant@chriseadslegal.com |

_____
**Penny Shrum**
**Clerk, Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board. To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
   ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
   ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.

   When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal. If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee. If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk. The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted. For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

   **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable. See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
[www.tn.gov/workforce/injuries-at-work/](www.tn.gov/workforce/injuries-at-work/)
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____
**Employee**

v.

_____
**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____    ☐ Motion Order filed on _____

☐ Compensation Order filed on_____    ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

## Parties

**Appellant(s)** (Requesting Party): _____  ☐ Employer ☐ Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*