
**FILED**
**Jun 18, 2026**
**07:00 AM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT JACKSON

| | |
|---|---|
| **COLTON VESTAL,**<br>    **Employee,**<br>**v.**<br>**TBDN TENNESSEE CO.,**<br>    **Employer,**<br>**And**<br>**GREAT AMER. ALLIANCE INS. CO.,**<br>    **Insurer.** | **Docket No. 2024-70-6741**<br><br>**State File No. 16621-2023**<br><br>**Judge Robert Durham** |

## COMPENSATION HEARING ORDER GRANTING BENEFITS

The Court held a Compensation Hearing on May 28, 2026, to determine Mr. Vestal's anatomic impairment from his work-related asthma. The Court finds that his impairment is 60% and awards benefits accordingly.

### History of Claim

In this accepted claim, Mr. Vestal was burning plastic at work when the fumes caused uncontrollable coughing so severe that his right lung collapsed. Over the next several weeks, he suffered multiple collapsed-lung episodes from uncontrolled coughing and ultimately had surgery to prevent further episodes. He also injured his shoulder during these coughing spells, resulting in a 1% impairment from his treating orthopedist, Dr. Kenneth Nord.

Mr. Vestal received authorized treatment for occupational asthma from Dr. Carla Burke initially and then pulmonologist Linda Sevin.

He testified about how the condition affects and limits him. He uses a steroid inhaler every morning, as well as an Albuterol rescue inhaler for flare-ups, which he uses two to four times a day. He never goes a day without using Albuterol at least once.

After walking about 100 feet, he is out of breath and must take a break. He is always tired and lacks stamina. His hands tingle from low oxygen levels. He is very careful about his environment and potential irritants that might trigger a flare-up. Dust, humidity, fragrances, candles, and cleaning supplies are some of the common irritants that can start a coughing spell. He stays at home most of the time.

Mr. Vestal tried to go back to work at TBDN but was constantly exposed to fumes. He also had an asthma attack when he tried to work for TBDN's sister company, TBTN. Although he has applied for some jobs, he has not attempted work since.

As for his asthma impairment, the pulmonology experts disagreed dramatically about his rating. After Dr. Sevin assigned a 60% rating, TBDN sent Mr. Vestal's records to pulmonologist Clair McGroder, who assigned 6%.

While both experts are pulmonologists, Dr. Sevin treated Mr. Vestal for over two years, administered testing to determine his lung function, and diagnosed his occupational asthma. She is a "pulmonary and critical care specialist" at Vanderbilt with a focus on occupational lung diseases, including asthma. She said Mr. Vestal's pulmonary function tests revealed a normal $FEV_1/FVC$ ratio. His "diffusing capacity," or how well oxygen was getting from his lungs to his blood stream, was also in the normal range. Dr. Sevin diagnosed Mr. Vestal with occupational asthma, with complications from his recurrent pneumothoraxes.

By contrast, Dr. McGroder, although board-certified in pulmonary and critical care, only reviewed Mr. Vestal's records and has limited experience using the AMA Guides. She specializes in patients with interstitial lung disease and is head of the interstitial lung disease program at Columbia University, where she also teaches. She routinely treats general pulmonary patients but has no formal training in using the AMA Guides, 6th edition and estimated she has only used the AMA Guides in rating impairment 10 to 12 times before.

The significant difference in the pulmonologists' ratings centered around which table from the AMA Guides to use and the import of results from two methacholine challenge tests, one administered by Dr. Sevin while Mr. Vestal was off of medication and one administered by Dr. Burke while medication was still in his system.

In calculating impairment, Dr. Sevin testified by deposition that she considered various circumstances, including that Mr. Vestal required surgery when most patients do not, his lasting chest pain with decreased mobility, and his youth.

She said his age could make his lung function look "normal" given his age and height, since the parameters set by the Guides are based on a small population that do not include a "lot of, you know, young, active 29-year-olds."

But she relied mostly on results from a methacholine challenge test she administered after Mr. Vestal was off medication for several weeks. She said it was "pretty common" for patients to have significant, uncontrolled asthma in their workplace that is not reproduced outside that environment. Thus, she needed "more specific measurements of airway hyperresponsiveness," like the methacholine challenge test, to make her assessment. The test revealed moderate airway hyperreactivity, showing a positive reaction on his second increased dose.

For her part, Dr. McGroder testified by deposition that she focused on Dr. Burke's November 2023 evaluation of Mr. Vestal, pulmonary function tests that were within normal limits, and Dr. Burke's methacholine challenge test that was negative. Notably, Mr. Vestal had been using an inhaled steroid only five days before the test. When used to diagnose asthma, test protocol requires the patient to be off steroids for two weeks.

However, Dr. McGroder explained that because she used Dr. Burke's result to determine impairment, not causation, the fact that Mr. Vestal was still under the influence of steroids at the time of the methacholine test was relevant to her determination that since he had normal lung function tests while receiving treatment, she could not use Table 5-5 to assess impairment.

As for the appropriate table to use, Dr. Sevin said that under Table 5-5, Mr. Vestal's impairment was "pretty straightforward," based on the "key factor" of his methacholine challenge test and because treatment did not control his symptoms. She gave him a "Class 4 impairment, which would be 60 percent whole person."

Conversely, Dr. McGroder discounted Table 5-5 based on her interpretation of section 5.6(b) of the Guides. Specifically, that passage tells the rater to "[n]ote that in the absence of airflow limitation with asthma treatment, Table 5-5 may not be used to determine impairment for airway hyperresponsiveness (specific or non-specific) alone." It then says that "the individual with airway hyperresponsiveness may have no measurable impairment (solely determined on the basis of lung function test values) but may still have disability for specific jobs."

Dr. McGroder interpreted this to mean that if there is no "overt obstructive ventilatory defect as in a decreased $FEV_1$ over FVC ratio, you cannot use a test for bronchial hyperreactivity, like the methacholine challenge test when the patient is

not receiving treatment, to determine impairment. It should be used for diagnosis only." Thus, she did not use Table 5-5 to assess Mr. Vestal's impairment because his objective tests, including Dr. McGroder's methacholine challenge test showed normal lung function with treatment.

She observed that the pulmonary system chapter of the AMA Guides has two tables: Table 5-5, which is specifically for asthma, and Table 5-4, which covers "pulmonary dysfunction." She said that in both tables, "pulmonary disfunction or dyspnea" is the "key factor" used as the "objective measure" of lung function.

Using Table 5-4, Dr. McGroder found that Mr. Vestal's lack of objective airflow limitations placed him in Class 0 in the objective tests section. Further, she placed him in Class 0 in the physical findings section because records did not describe a wheeze or any airflow symptoms during doctor's visits. However, he qualified for Class 3 in the history section. Considered together, Dr. McGroder felt that the most accurate impairment for Mr. Vestal was 6%, as described in Class 1.

Dr. Sevin disagreed with Dr. McGroder's opinion that Table 5-5 would not apply, although she admitted the language Dr. McGroder relied upon should have been more detailed. She interpreted the statement "in the absence of airflow limitation with asthma treatment, Table 5-5 may not be used to determine impairment for airway hyperresponsiveness alone" to mean that "if, you know, you just take someone off the street and they have no symptoms and they have an abnormal methacholine challenge, you cannot use that to suggest an impairment." She explained that Mr. Vestal had a known occupational exposure with severe adverse outcomes, so this statement did not apply to him.

She agreed that before conducting her methacholine challenge, she told Mr. Vestal that he needed to be off his inhaled steroid for three to four weeks. Otherwise, it could have produced a false-negative test, and he would appear to have no airway hyperresponsiveness, even if he did. Dr. Sevin said that this appears to have happened with Dr. Burke's test, since Mr. Vestal had only been off his medicine for a few days. Although the small-airways volume dropped, it only dropped to 18%, not 20%, and did not meet the challenge threshold "by a hair."

Dr. Sevin cited multiple factors that could have led to the negative test, such as the presence of steroids. Or perhaps his baseline was less than it should have been because he was still experiencing chest pain.

Despite vigorous cross-examination, Dr. Sevin would not concede that the language in the AMA Guides prevented her from using Table 5-5 to assess Mr.

Vestal's impairment. Rather, she utilized it because Mr. Vestal has asthma, and that is the table the AMA Guides designated for rating asthma. She concluded, "[I]f we're not going to use this table for this patient, I don't know who we're going to use this table for."

**Law and Analysis**

Mr. Vestal has the burden of proving the essential elements of his workers' compensation claim by a preponderance of the evidence. *Scott v. Integrity Staffing Solutions,* 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). Here, the only disputed issue is his anatomic impairment.

Tennessee Code Annotated section 50-6-204(k) states that a treating physician must assign an anatomic impairment rating using the applicable edition of the AMA Guides. This impairment shall be presumed correct but may be rebutted by a preponderance of the evidence. As the treating physician, Dr. Sevin assessed a 60% impairment, which is presumed correct. Dr. McGroder determined the correct impairment was only 6%, a dramatically different opinion.

When confronted with conflicting opinions, the Court has discretion to determine which opinion to accept. *Patterson v. Huff & Puff Trucking*, 2018 TN Wrk. Comp. App. Bd. LEXIS 33, at *9 (July 6, 2018). The Court may consider, among other things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts." *Orman v. Williams Sonoma, Inc.,* 803 S.W.2d 672, 676 (Tenn. 1991).

This case presents an unusual situation in that the doctors agree on all the underlying facts and diagnoses. They both diagnosed Mr. Vestal with work-related asthma that is inadequately controlled through medication. They also agreed that Mr. Vestal's pulmonary function tests were all within normal limits. Finally, they agreed that Mr. Vestal's methacholine challenge test was negative while still under the influence of steroids but positive when he was not.

The issue lies in how they interpret section 5.6(b) of the AMA Guides, and whether Table 5.5 can be used to assess impairment despite normal pulmonary function tests. The section reads:

Note that in the absence of airflow limitation with asthma treatment, Table 5-5 may not be used to determine impairment for airway

hyperresponsiveness (specific or nonspecific) alone. The individual with airway hyperresponsiveness may have no measurable impairment (solely determined on the basis of lung function values) but may still have disability for specific jobs.

Dr. McGroder interpreted this section to mean that since Mr. Vestal's pulmonary function tests were all normal and his first methacholine challenge test, which was performed while he was receiving "asthma treatment," was negative, the AMA Guides did not permit her to use Table 5.5 in assessing impairment. She maintained this interpretation even though Mr. Vestal continued to suffer from asthmatic attacks due to environmental irritants and even though the second methacholine challenge test, performed after Mr. Vestal had stopped using the steroid for several weeks, was positive. Nevertheless, she believed Mr. Vestal was impaired by his asthma, so she used Table 5.4, titled "Pulmonary Disfunction" to determine a 6% impairment.

Dr. Sevin, on the other hand, emphasized the word "alone" in section 5.6(b). She believed that Mr. Vestal's recurrent asthmatic reactions, along with the positive result from the second methacholine challenge test, were enough to justify using Table 5.5 despite the normal pulmonary function tests and Dr. Burke's negative methacholine test. In essence, she believes that since Mr. Vestal suffers from asthma, Table 5.5 must be used to assess impairment. Given Mr. Vestal's methacholine reaction and his continued symptoms despite treatment, she believes that a 60% impairment is warranted.

In determining which interpretation is correct, the Court considers Table 5-7, which instructs the evaluator to "[s]ee Table 5-5 for asthma, see Table 5-4 for other diseases." Both doctors agree that Mr. Vestal suffers from asthma and not another "obstructive disorder." Thus, Dr. McGroder's use of Table 5-4 to assess impairment was inappropriate.

Given that Table 5-5 is the only means of assessing impairment for asthma, Dr. Sevin's approach is more reasonable than Dr. McGroder's. The parties do not dispute that Mr. Vestal suffers from recurrent and severe bouts of asthma triggered by a variety of irritants and poorly controlled through medication. Thus, the positive methacholine challenge test "alone" is not the only indication of asthma, and Dr. Sevin was correct in using Table 5-5 to assess Mr. Vestal's impairment.

Under the circumstances, the Court finds that TBDN failed to rebut the presumption of correctness afforded Dr. Sevin's impairment rating of 60%. When

combined with the undisputed 1% impairment for Mr. Vestal's shoulder injury, TBDN must pay 274.5 weeks of permanent partial disability benefits, which equals $243,198.77 at the agreed compensation rate of $885.97.

**IT IS ORDERED:**

1.  TBDN shall pay Mr. Vestal a lump sum of $243,198.77 in permanent partial disability benefits. The parties agreed that Mr. Vestal has received an advance of $5,397.94. The parties further agreed that TBDN will pay $12,692.40 in underpaid temporary disability benefits. Thus, the total amount TBDN shall pay in lump sum to Mr. Vestal is $250,493.23.

2. Mr. Vestal's counsel is entitled to a 20% attorney fee, subject to court approval on the submission of an affidavit, which equals $50,098.65.

3. Mr. Vestal may file a motion to recover his discretionary costs.

4. Dr. Burke, Dr. Sevin, and Dr. Nord remain Mr. Vestal's treating physicians for his work-related injury. TBDN shall pay for reasonable, necessary, and related medical treatment for this injury.

5. TBDN shall pay costs of $150.00 to the Court Clerk within five business days of this order becoming final.

6. TBDN shall file with the Court Clerk a Statistical Data Form within ten business days of this order becoming final.

7. This Compensation Order is a final adjudication upon the merits of Mr. Vestal's claim for benefits. Unless appealed, it shall become final in 30 days.

ENTERED June 18, 2026.

_____
**JUDGE ROBERT DURHAM**
**Court of Workers' Compensation Claims**

**APPENDIX**

<u>Exhibits</u>:
1. Joint Pre-Hearing Statement
2. Dr. Sevin's deposition with attachments
3. Dr. McGroder's deposition with attachments

**CERTIFICATE OF SERVICE**

I certify that a copy of this Order was sent on June 18, 2026.

| Name | Email | Service sent to: |
|---|---|---|
| Spencer Barnes | X | spence@morrisonbarnes.com |
| Conner Sestak | X | csestak@morganakins.com |

_____
**PENNY SHRUM, COURT CLERK**
wc.courtclerk@tn.gov



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board. To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
   ➤ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
   ➤ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.
   When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal. If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee. If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk. The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted. For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

   **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable. See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



## NOTICE OF APPEAL
Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____      ☐ Motion Order filed on _____

☐ Compensation Order filed on_____      ☐ Other Order filed on_____

issued by Judge _____.

### Statement of the Issues on Appeal
Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

### Parties
**Appellant(s)** (Requesting Party): _____ ☐ Employer ☐ Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*